821 So.2d 663 (2002)
Jammy Leo PORTER, et al., Plaintiffs-Appellees
v.
Clarence William PORTER, Defendant-Appellant.
No. 36,007-CA.
Court of Appeal of Louisiana, Second Circuit.
June 12, 2002.
*664 James A. Hobbs, West Monroe, for Appellant.
*665 Herring & Downs, L.L.C., Charles E. Herring, Jr., Bastrop, for Appellee.
Before GASKINS, CARAWAY and DREW, JJ.
GASKINS, J.
The defendant, Clarence William "Bill" Porter, appeals from a trial court judgment rejecting his claim to revoke donations to his son, Clyde Woodrow "Butch" Porter, and his grandson, Jammy Leo Porter, due to ingratitude and cruel treatment. The plaintiffs, Jammy Leo Porter, Butch Porter, and Porter, Porter and Porter d.b.a. W.K. Porter & Sons House Moving, answered the appeal. They claim that the trial court erred in finding that there was no partnership, in dissolving a temporary restraining order (TRO) and denying a preliminary injunction against the defendant, and in failing to award damages in favor of the partnership and plaintiffs for breach of the defendant's fiduciary obligation. They also seek damages and attorney fees under the Unfair Trade Practices and Consumer Protection Act. For the following reasons, we affirm the trial court judgment.

FACTS
W.K. Porter & Sons House Moving was established in 1945 by the defendant's father. After he died, the defendant and his brother W.L. "Buck" Porter, continued to operate the business. The defendant's son, Butch, began helping in the business when he was 10 or 11 years old and began working full time when he was a teenager. Butch is illiterate, but can sign his name. In 1991, Bill became ill and could not continue with the physical labor required in the business.[1] Butch was not able to run the business by himself. Jammy, Butch's son, was in the armed forces and stationed overseas during the Gulf War. A hardship discharge was obtained for Jammy and he returned to help his father and grandfather in the family business. The parties lived in close proximity to each another. As found by the trial court, the parties worked hard, drank beer, and were abusive to each other.
Bill, Butch, and Jammy worked together from 1991 until 1998. Bill bid jobs and supervised, Butch did manual labor, and Jammy did welding, equipment repair, and manual labor. The parties lived out of a common bank account in the name of C.W. Porter d.b.a. W.K. Porter and Sons House Moving Contractor. Bill eventually added Jammy as a signatory to the account. Butch and Jammy were each given about $100 per week and Bill also paid their utilities and private school tuition for Jammy's children.
Bill developed pulmonary problems requiring surgery and he thought that he might not survive the illness. On November 11, 1998, he donated all his interest in the tools, equipment, and other items used in the house moving business to Butch and Jammy. He donated 51% to Jammy and 49% to Butch. He also donated to Jammy a 10.2 acre tract of land on which the business was located, reserving the usufruct. Butch and Jammy understood that it was Bill's intention to give the family business to them.
Sometime after the donation, Bill thought that Jammy was drinking too much and feared that he might write large checks because he had access to the defendant's *666 bank account. Bill described an incident in which he broke up a loud party with drinking at Jammy's house. Jammy claimed that he and friends were merely watching a video in Jammy's house when Bill burst in and insisted that Jammy's guests leave. Shortly thereafter, Bill removed Jammy as a signatory to the bank account. Bill also withdrew a large amount of money from the account. These events led to a falling-out among the parties. The defendant sought to reclaim the items donated to the plaintiffs and to keep them off the donated property. Local law enforcement personnel were called by each of the parties on several occasions. Relations between the parties deteriorated, giving rise to the present lawsuit.
On November 21, 2000, Jammy, Butch, and "Porter, Porter, and Porter d.b.a. W.K. Porter & Sons House Movers" filed suit against Bill. The plaintiffs alleged that the parties had a partnership, although the agreement was not reduced to writing. They claimed that Bill breached his fiduciary duty to the partnership and converted partnership assets. They cited the donations by Bill and alleged that they thought he was donating his interest in the partnership and its assets to them. They alleged that beginning on November 16, 2000, Bill removed Jammy as a signatory on the business bank account, removed equipment, took control of the phone listing, intercepted business messages, referred business to competitors, cut off the electricity to the business, interfered with the partnership and its customers, and lodged false criminal complaints with the Morehouse Parish Sheriffs Office. According to the plaintiffs, the defendant violated the provisions of the Unfair Trade Practices and Consumer Protection Law contained in La. R.S. 51:1401 et seq., when he competed against the partnership business. They claimed damages to the partnership and the partners and asked for reasonable attorney fees. They also sought a TRO and a preliminary injunction. The trial court issued the TRO on November 21, 2000, prohibiting the defendant from disposing of, concealing, alienating, or encumbering property belonging to or used by the house moving business or individually by Jammy or Butch. Bill was also prohibited from intercepting phone calls to the business and from removing telephone lines and taped phone messages made to the business. The defendant was precluded from referring customer calls to competitors, from withdrawing funds from the company bank account, from denying Jammy and Butch access to partnership records, from interfering in the day-to-day operation of the business and from cutting off utilities to the business. On December 12, 2000, the defendant filed an answer and reconventional demand. He claimed that there was no partnership and that the bank account in question was his personal account. In his reconventional demand, he sought to revoke the donations made to the plaintiffs. He claimed that he was seriously ill in 1998 and was pressured by the plaintiffs to make the donations. He alleged that after the donations, the plaintiffs were ungrateful and treated him cruelly, providing grounds to revoke the donations.
Trial on this matter was held April 16-18, 2001 and May 18, 2001. According to the trial court, the first issue was whether there was a partnership or a sole proprietorship. The court concluded that there was no partnership. Although partnership income tax returns were filed showing that each party owned a 1/3 interest in the business, the court stated that income tax returns are entitled to some evidentiary weight, but are not dispositive of whether there is a partnership. The court found that the defendant never had any intention of forming a partnership with the plaintiffs. *667 There were no discussions in this regard between the parties. The defendant made all the decisions about the business. The court found that donations of real property and equipment were not made to the partnership. Real property cannot be contributed to a partnership that is not formed by a written partnership agreement. Finding that there was no partnership, the trial court dissolved the TRO and denied the plaintiffs' request for an injunction. It also dismissed all of the plaintiffs' other claims. With no discussion of its reasoning, the trial court found that the defendant failed to prove his right, by a preponderance of the evidence, to revoke the donations on grounds of cruel treatment or grievous injury. Accordingly, Bill's claims against the plaintiffs were dismissed. On August 27, 2001, judgment was filed by the trial court, dismissing all of the parties' claims. The defendant appealed and the plaintiffs answered the appeal.

STANDARD OF REVIEW
An appellate court may not set aside a trial court's or jury's findings of fact in absence of manifest error or unless it is clearly wrong. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989).
A reviewing court must do more than simply review the record for evidence which supports or controverts the trial court's findings. It must review the record in its entirety to determine whether the trial court's findings were clearly wrong or manifestly erroneous. Also, the reviewing court must ascertain whether the fact finder's conclusions were reasonable. Even when an appellate court may feel that its own evaluations are more reasonable than the fact finder's, reasonable determination and inferences of fact should not be disturbed. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The appellate court's disagreement with the trial court, alone, is not grounds for substituting its judgment for that of the trier of fact. Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106 (La.1990).
Where there are two permissive views of evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State, Through Department of Transportation and Development, supra; Lewis v. State, Through Department of Transportation and Development, 94-2370 (La.4/21/95), 654 So.2d 311.

REVOCATION OF DONATIONS
The defendant appealed the trial court judgment, arguing that the trial court erred in failing to revoke the donations to the plaintiffs on grounds of ingratitude and cruel treatment. This argument is without merit.
A donation inter vivos may be revoked on account of ingratitude of the donee. La. C.C. art. 1559(1). Ingratitude can take place only in three cases: (1) if the donee has attempted to take the life of the donor; (2) the donee has been guilty of cruel treatment, crimes or grievous injuries against the donor, or (3) the donee has refused the donor food when the donor was in distress. La. C.C. art. 1560; Whitman v. Whitman, 31,814 (La.App.2d Cir.3/31/99), 730 So.2d 1048.
Grievous injuries sufficient to revoke a donation have been defined as any act naturally offensive to the donor. Perry v. Perry, 507 So.2d 881 (La.App. 4th Cir.1987), writ denied, 512 So.2d 465 (La. 1987). The jurisprudence has held that cruel treatment or grievous injury sufficient to revoke a gratuitous donation may include adultery by a spouse, seizing property *668 belonging to a parent, filing suit against a parent alleging criminal activity, and slandering the memory of the donor. Perry v. Perry, supra; Spruiell v. Ludwig, 568 So.2d 133 (La.App. 5th Cir.1990), writ denied, 573 So.2d 1117 (La.1991); Sanders v. Sanders, 33,865 (La.App.2d Cir.9/27/00), 768 So.2d 739; Whitman v. Whitman, supra; Succession of McDonald, 154 La. 1, 97 So. 262 (1923).
The defendant cited six different acts of cruelty engaged in by the plaintiffs which he claims were sufficient to revoke the donations:
1. Filing suit and getting a TRO to prevent the defendant from pursuing his livelihood.
2. Making threats to beat the defendant.
3. Taking the defendant's truck, briefcase and checkbook and refusing to return the checkbook as of the date of trial.
4. Accusing the defendant of theft and attempting to have him arrested.
5. Drawing a weapon on a person thought to be the defendant.
6. Intentionally running into a truck occupied by the defendant.

Lawsuit
According to the defendant, the plaintiffs' action in filing suit and obtaining a TRO effectively prevented him from pursuing a livelihood. He claims that this is sufficient evidence of ingratitude to revoke the donations. The defendant cites Perry v. Perry, supra, in which a son obtained a judgment against his father and then seized the father's personal movable property in satisfaction of the judgment. That action was held to be sufficient for the revocation of a donation by the father to the son.[2] The defendant claims that the TRO in this case was analogous to the seizure in Perry.
The plaintiffs counter that Bill donated all the equipment and property used in the house moving business to them and they thought they were business partners. They deny that they excluded Bill from participation in the business or from pursuing a livelihood. Rather, it was the defendant who terminated his relationship with the plaintiffs and set about to damage the plaintiffs' business endeavors. The plaintiffs argue that it was Bill who, after making the donations, sought to reclaim donated property and to exclude Jammy and Butch from working in the business. They cited the defendant's numerous actions in shutting off utilities, cutting phone lines, denying access to funds and taking previously donated property. They argue that the suit was filed to protect the business and the plaintiffs' livelihood.

Threats
The defendant claims that Butch threatened to beat him if he caught him setting foot on his property again. Apparently the property where Butch lives is owned by Bill, but Butch has a usufruct. According to Butch, he did curse at his father, but only after being provoked by Bill coming to his house and looking in the windows. Butch testified that cursing at each other was the norm in their family.
*669 The record shows that the parties' normal conversational style was to speak to each other in rough language. According to Jimmy Leshawn West, Bill "cussed all the time. That Porter's language cussing."
William Gorman testified that cursing was normal for the Porters. He stated, "I'll put it this way. I wouldn't talk to my father the way they do you know but they do that all the time." Mr. Gorman said, "I've heard Butch tell his daddy that if he didn't get the hell out of the way he's [going to] run over him.... I've heard Mr. Bill turn around and tell Butch that he ought to take that jack bar and knock his brains out but that's just the way they talk to one another...." According to Mr. Gorman, he never interpreted any of the exchanges to convey a serious threat.

Taking of Truck
The defendant claims that Jammy and Butch took his personal truck away from him. He contends that his guns, checkbook and briefcase were in the truck. He asserts that he had to call the sheriffs office to get the truck returned. He claims that the checkbook and briefcase were never returned. Jammy testified that he took the truck because he believed it belonged to the business. The truck had lights on top and W.K. Porter and Sons signs on each side. He returned the vehicle when asked to do so by the local sheriffs office.

Theft Accusations
On November 22, 2000, the plaintiffs contacted the local sheriffs office, contending that Bill was taking property from the business. This concerned a load of tires that the defendant claims were given to him. Deputy Jeffrey Woodall was dispatched to the scene. He was shown the TRO and was also shown where telephone wires had allegedly been pulled out of the wall by Bill. Bill stated that he was not going to abide by the TRO. The deputy started to arrest the defendant and then realized that he had not yet been served with the TRO.

Gun
The defendant claims that Jammy pointed a gun at Jimmy Leshawn West, thinking that he was the defendant. Mr. West testified that after the trouble started between the parties, he went to Jammy's house around 4:00 a.m. one morning to inquire about a hunting stand. Jammy greeted him holding a pistol, but did not point it at Mr. West. According to Mr. West, Jammy thought he was Bill. When asked why Jammy would arm himself when he thought his visitor was his grandfather, Mr. West replied that Bill had already shot one person and "you never know what he'll do."
According to the defendant, he once shot his nephew when the boy got into a car and ran into the defendant's new vehicle several times. Bill shot into the door of the nephew's vehicle. The boy got out of the car and approached the defendant. At that point, Bill shot him in the chest at a range of three feet with a .38 caliber weapon that he still carries. The boy did not die and Bill claimed that they are now friends. The defendant also stated that the grand jury declined to indict him for any offense arising from that incident.

Tractor Incident
The defendant claims that Butch struck the defendant's truck with a tractor or a forklift. In his testimony at trial, Bill stated that Butch "rammed me about four more times at close distance. Picked up on it and liked to turn the truck over."
Deputy Woodall testified that on December 12, 2000, Butch and Jammy asked sheriffs deputies to come to the Porter property while they moved some equipment. Butch was driving a forklift or *670 tractor. Bill moved his truck into the path of the tractor, causing Butch to hit the truck. Butch could not have avoided the impact. However, Butch then backed up and hit the truck again. Deputy Woodall stated that Butch was very upset. Bill then approached Deputy Woodall from behind and pushed him. The deputy pushed the defendant off and sent him to the other side of the property.
Jammy testified that Bill drove his truck into the path of the tractor. He began laughing and Butch hit him again. Bill got out of the truck, bumped the deputy and stuck his finger in Jammy's face.
Butch testified that Bill drove his truck into the path of the tractor and then started laughing. Butch lost his temper and hit the truck again.

Discussion
The record shows that before the present difficulties, the parties were on good terms. Witnesses testified that Bill had commented to customers that he was proud of his son and grandson. Butch and Jammy took care of Bill during his illnesses and worked diligently in the family business for numerous years. Although the various witnesses testified about the rough language and lifestyle common to the parties, it appears that they were supportive of each other.
Under ordinary circumstances, the instances alleged by the defendant would appear, at first blush, to demonstrate ingratitude by the plaintiffs. In light of the unusual family dynamics present in this case, we find that the trial court did not err in finding otherwise. Based upon the facts peculiar to this case, the incidents complained of do not rise to the level of cruel treatment evidenced by the facts in Perry v. Perry, supra, in which the actions by the offending donee amounted to unjustified harassment of the donor. See also Sanders v. Sanders, supra.
Similarly, in Spruiell v. Ludwig, supra, the court held that the filing of a shareholders' derivative suit by a daughter against her mother was not sufficient grounds for revocation of a donation for ingratitude. However, the daughter's reconventional demand raising unfounded criminal charges was held to be sufficient evidence of ingratitude to revoke the mother's donations. The court found that the daughter and her children sought to obtain more of the family property for themselves. The court also noted that the trial court had been deeply moved by the sincerity of the mother's testimony and conversely by the insincerity of the daughter's testimony.
As in Spruiell v. Ludwig, supra, the trial court in the present case had the advantage of seeing and hearing the parties. The trial court was obviously impressed with the sincerity of the plaintiffs. In each instance, the alleged cruel treatment was provoked in large part by the defendant. The actions of the plaintiffs were not offensive measures, but were largely defensive measures aimed at preservation of life, livelihood and property. They were not committed maliciously or in total disregard for the well-being of the defendant.[3] We find that the trial court was not manifestly erroneous or clearly wrong in finding that the plaintiffs' actions did not constitute cruel treatment or grievous injury sufficient to revoke the donations. *671 This holding is strictly limited to the facts present in this case.

EXISTENCE OF PARTNERSHIP
In their answer to the appeal, the plaintiffs claim that the trial court erred in finding that there was no partnership between the parties, that the defendant had no intention of forming a partnership and that there was never any discussion between the parties in this regard. This argument is without merit.
A partnership is a juridical person, distinct from its partners, created by a contract between two or more persons to combine their efforts or resources in determined proportions and to collaborate at mutual risk for their common profit or commercial benefit. La. C.C. art. 2801. Each partner participates equally in profits, commercial benefits, and losses of the partnership, unless the partners have agreed otherwise. The same rule applies to the distribution of assets, but in the absence of contrary agreement, contributions to capital are restored to each partner according to the contribution made. La. C.C. art. 2803.
To establish the existence of a partnership without a written agreement, the plaintiff has the burden of proving that (1) the alleged partners mutually agreed to form a partnership and to participate in the profits which would accrue from the business in determined proportions; (2) they agreed to share in the losses as well as the profits of the partnership; and (3) the property or stock of the enterprise formed a community of goods in which each party has a proprietary interest. The prerequisites for establishing a partnership are that both parties intend to have a business relationship between them and that the relationship has all the major characteristics of a partnership. LaRocca v. Bailey, XXXX-XXXX (La.App. 3d Cir.11/7/01), 799 So.2d 1263; Butler v. Sudderth, XXXX-XXXX (La.App. 5th Cir.4/24/01), 784 So.2d 125, writ denied, XXXX-XXXX (La.10/5/01), 799 So.2d 485; Johnson v. Antoine, 98-1285 (La.App. 5th Cir.5/19/99), 735 So.2d 856. These criteria require findings of fact. Medline Industries, Inc. v. All-Med Supply & Equipment, 94-1504 (La.App. 1st Cir.4/7/95), 653 So.2d 830.
The plaintiffs argue that they thought that they had a partnership with the defendant. Butch Porter testified that whenever he asked his father for more money, he was told that the money was for his part of the business. He testified that his contribution to the partnership was his labor. In 1998 when Bill donated the equipment to Butch and Jammy, Butch testified that he thought he already owned part of the equipment.
Jammy Porter testified that he returned from the Army to help with the family business and that his grandfather promised that the business would be his someday. He claimed that he lived off unemployment for six months and then received $100-$150 per week from the business. At the time of the equipment donation in 1998, Jammy claims that Bill had already told him that Jammy was a partner in the business. According to Jammy, Bill contributed labor to the partnership when he was able to do so and also contributed the use of the equipment.
Jammy testified that the business bank account was in the name of C.W. Porter d.b.a. W.K. Porter and Sons House Moving Contractor. Business expenses were paid out of this account as well as the living expenses of Bill, Butch, and Jammy.
In support of their claim that the business was a partnership, the plaintiffs called the company accountant, Neal Adams. Mr. Adams testified that he had *672 been doing a partnership tax return for the business since 1985. According to the tax return in 1997, Butch and Bill were partners. In 1998, Jammy was added to the return as a partner, at Bill's request, with each holding a 1/3 interest. In 1999, Jammy's individual tax return showed income from the partnership. No salaries were paid by the business. Mr. Adams testified that he understood that the parties operated as a partnership. He also stated that there were no articles of partnership for the business. Mr. Adams testified that many times in dealing with family businesses, he filed partnership tax returns when asked to do so by the family without any written showing that a partnership existed.
Charles Burns of the Mer Rouge State Bank testified that the bank account at issue in this case was opened in 1995 by Bill Porter. Bill was originally the only signatory on the account and later Jammy was added. Jammy was deleted as a signatory on November 6, 2000. Although Bill testified that he had been hearing rumors that Jammy was going to have him removed from the account, Mr. Burns stated that because the account was opened by Bill, Jammy could not have removed Bill. The account was in Bill's name d.b.a. W.K. Porter and Sons House Moving Contractor.
In its reasons for judgment, the trial court found that Bill never intended to form a partnership with the plaintiffs. He merely brought his son and grandson into the family business as his father had done with him. It was Bill's intention that Butch and Jammy take over the business when Bill died. Both plaintiffs understood this. The court noted that Butch did not participate in the management of the business. He provided only physical labor. The court found that Bill made all the decisions about the business and that he "ruled the roost."
We do not find that the trial court's finding was manifestly erroneous or clearly wrong. As noted by the court, the filing of a partnership tax return may be entitled to some evidentiary weight for determining if a business is a partnership, but is not dispositive. Smith v. Scott, 26,849 (La.App.2d Cir.5/10/95), 655 So.2d 582, writ denied, 95-1450 (La.9/22/95), 660 So.2d 475; Labat v. Labat, 232 La. 627, 95 So.2d 129 (1957). See and compare Harris v. Wallette, 538 So.2d 728 (La.App. 2d Cir.1989). In the instant case, there is no showing that Bill Porter intended to form a partnership with Butch and Jammy. Bill owned that equipment and land that he donated in 1998 to the plaintiffs. Also, the donations were made to Butch and Jammy individually and not to the partnership. If the defendant thought he had a partnership with the plaintiffs and the equipment and land used in the business belonged to the partnership, the donation by an individual to other individuals would not have been valid.
Bill was in charge of the business, determining what jobs would be done, what hours would be worked and what amounts would be paid to the plaintiffs. Further, the bank account used for the business was in Bill's name and he had the right to decide who to include or exclude as a signatory. For several years, the defendant was the only person with access to those funds. Although a partnership tax return was filed for the business, Bill never treated Butch or Jammy as partners. While the plaintiffs may have thought they were partners with the defendant, there is no showing that the defendant ever intended to form a partnership with them. In order to establish the existence of a partnership without a writing, there must be a *673 showing that all the parties intended such a relationship.
Accordingly, we affirm the trial court judgment finding that the plaintiffs failed to prove that a partnership existed in this case. Because there was no partnership, we also affirm the court's action in vacating the TRO, refusing the preliminary injunction, and denying the plaintiffs' claims for unfair trade practices.

CONCLUSION
For the reasons stated above, we affirm the trial court judgment dismissing the claims of the plaintiffs, Jammy Leo Porter and Clyde W. Porter, based upon a finding that the parties did not have a partnership. We also affirm the trial court judgment dismissing the claims of the defendant, Clarence William Porter, based upon a finding of insufficient evidence of ingratitude to revoke the donations made by the defendant to the plaintiffs. Costs in this court are assessed one-half to the plaintiffs, Jammy Porter and Clyde W. Porter, and one-half to the defendant, Clarence William Porter.
AFFIRMED.
NOTES
[1] Apparently, Buck was still involved in the business, but in 1993, he withdrew and set up Bastrop House Movers for his son, Ralph. According to Bill's trial testimony, he and Buck had a dispute over the ownership of their father's business which is the subject of ongoing litigation. Also, Ralph Porter testified that Bill once filed a lawsuit against him for invasion of privacy, claiming that Ralph was videotaping Bill's house.
[2] In Perry v. Perry, supra, the father had given the son a substantial amount of stock in a corporation to finance his law practice. The son sold the stock back to the corporation, with the father signing a guarantee. The son was paid a lump sum of $150,000 for the stock, then $5,000 per month for approximately seven years. The corporation then took bankruptcy. The son sued on the guarantee and receiving a judgment in the amount of $163,249.28 against the father. To execute on the judgment, the son had personal items of his parents seized, including jewelry, furniture and appliances.
[3] The plaintiffs also contend that the donations were remunerative and not subject to revocation. They claim that the donations were made for the years of work they did at below minimum wage, on the promise that some day the business would belong to them. Because we find that the incidents complained of do not support a revocation of the donations, we do not reach a discussion of this argument.