867 So.2d 935 (2004)
BONOMO BUILDERS, INC., Plaintiff-Appellee,
v.
AZTEC PAVING & HEAVY CONSTRUCTION COMPANY, Defendant-Appellant.
No. 38,236-CA.
Court of Appeal of Louisiana, Second Circuit.
March 3, 2004.
Mills, Turansky & Cox by George H. Mills, Jr., Shreveport, for Appellant.
*936 Booth, Lockard, Politz, Lesage, Hayter & Odom, L.L.C. by Mark Watkins Odom, Shreveport, for Appellee.
Before CARAWAY, PEATROSS and MOORE, JJ.
MOORE, J.
Bonomo Builders, Inc. ("Bonomo"), the general contractor constructing a large warehouse owned by Murphy Bonded Warehouses, Inc. ("Murphy"), subcontracted with Aztec Paving & Heavy Construction Co., ("Aztec") to install the concrete foundation for the warehouse. After Aztec completed a portion of the work, heavy rains halted progress. The pad upon which the concrete slabs were to be poured became water-soaked and unfit to pour concrete. A dispute arose over the earthen pad and the progress of the job. Aztec subsequently refused to communicate with Bonomo and missed scheduled meetings with Bonomo. Finally, Aztec abandoned the project. Bonomo subsequently completed the job and filed suit against Aztec for the additional costs it incurred in completing the job. Aztec answered, claiming Bonomo had breached the contract first and demanded additional payments for work it completed on the site. After a trial on the matter, the district court held that Aztec breached the contract and was liable to Bonomo for damages. From a judgment holding it liable for $180,508.43 in damages and $15,000.00 in attorney fees, Aztec appeals. We affirm.

FACTS
Bonomo, a general contractor, was hired to build a warehouse for Murphy Bonded Warehouses, Inc. on a 160-acre site in Red River Parish. Bonomo subcontracted with Aztec to install approximately 150,000 square feet of reinforced concrete foundation, including a ramp and truck dock containing 1500 square feet of concrete, all for the agreed sum of $659,450.00.
Bonomo and Aztec completed the Subcontractor Agreement on February 10, 2000, which included an attached letter proposal from Aztec forming part of the contract. This letter was dated and signed by Aztec's president, Samuel C. Estis, on January 12, 2000 and executed by John M. Bonomo on February 9, 2000. In the letter, Aztec estimated that the work would be completed in six weeks from the date of commencement. The agreement required completion of the work no later than April 15, 2000. Importantly, the contract provided for a $500.00 per calendar day liquidated damages penalty if not completed by that date. Aztec agreed to work a minimum 30-man work force 10 hours a day, 7 days a week except holidays and adverse weather conditions, but there was no provision for time extensions in the event of the latter.
The base upon which the concrete foundation was to be poured consisted of a raised pad built from soil tested, selected, and recovered from borrow pits on the 160-acre warehouse site. The 300' by 500' surface of the pad was four to five feet in height above the surrounding grade, extending five feet outside the projected building line before tapering down on a 4:1 slope ratio to ground level. Neither Bonomo nor Aztec had a role in the construction of the pad. Instead, the pad was constructed by one B.J. Burnell, pursuant to a separate contract with Murphy.
Aztec began working on the project in mid-February of 2000, but frequent and heavy rains soon hampered progress. The earthen pad became saturated with water, rendering it impossible to pour concrete. Under pressure to complete the work, Aztec personnel apparently caused ruts in the pad by driving trucks or equipment on it, which further prevented the water *937 from draining off the pad. At Bonomo's request, Aztec made repeated attempts to "dewater" the pad, i.e, remove the water, and prepare the earthen pad to pour concrete. However, eventually Aztec ceased communicating with Bonomo, and on or about April 24, 2000, Aztec removed its equipment and construction materials from the site and never returned. Bonomo made a demand in writing on May 1, 2000 for Aztec to complete the contract, but Aztec refused.
Bonomo hired another subcontractor, Fred White, to complete the concrete work for a cost of $115,203.11. Bonomo subsequently filed suit against Aztec for damages it sustained as a result of Aztec's failure to complete the project. Aztec answered by alleging, among other things, that Bonomo breached the contract prior to its quitting the job because the concrete pad was not made of sand as represented by Bonomo. Aztec filed a reconventional demand for $120,895.03 for sums it claims it was still owed under the contract and for an additional $20,130.00 for expenses incurred in attempting to pump the water from the site and to re-work the soil and repair damage to the earthen pad which it claims were outside the scope of the contract.
The case was tried on separate days over a period of several months. After the trial but before the court rendered an opinion, Aztec filed peremptory exceptions of no right of action and failure to join a party under La. C.C.P. art. 641. The trial court overruled the exceptions and entered a judgment in favor of Bonomo for the amount sued upon and denied Aztec's reconventional demands.
In its reasons for judgment, the trial court stated that the evidence adduced at trial supported Bonomo's claim for breach of contract against Aztec. Aztec's refusal to attend mandatory meetings to discuss the project status, failure to provide the manpower and work the hours required under the terms of the subcontract, and ultimately abandoning the job, constituted a breach of contract.
The court rejected Aztec's allegation that Bonomo had already breached the contract by the time Aztec left the job as being unsupported by the evidence. Aztec subsequently filed this appeal.

Discussion
An appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State, through Dept. of Transp. and Dev., 617 So.2d 880 (La.1993). A reviewing court must do more than simply review the record for evidence which supports or controverts the trial court's findings. It must review the record in its entirety to determine whether the trial court's findings were clearly wrong or manifestly erroneous. Also, the reviewing court must ascertain whether the fact finder's conclusions were reasonable. Even when an appellate court may feel that its own evaluations are more reasonable than the fact finder's, reasonable determinations and inferences of fact should not be disturbed. Simpson v. Restructure Petroleum Marketing Services, Inc., 36,508 (La. App.2d Cir.10/23/02), 830 So.2d 480; Porter v. Porter, 36,007 (La.App.2d Cir.6/12/02), 821 So.2d 663. Where there are two permissible views of evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, supra.
A court is not to be concerned with the wisdom or folly of a contract. It cannot annul or amend it simply to avoid some supposed hardship arising therefrom. Its duty is confined to the ascertainment of the limits of the rights and obligations of the contracting parties as they have defined *938 them for themselves. Woolf & Magee v. Hughes, 95-863 (La.App. 3 Cir. 12/6/95), 666 So.2d 1128, writ denied, 96-0073 (La.3/15/96), 669 So.2d 427. A court cannot undermine a contract simply because it was a bad deal for one of the parties. Billingsley v. Bach Energy Corp., 588 So.2d 786 (La.App. 2d Cir.1991).
In its first assignment of error, defendant alleges that there was a mutual mistake regarding the plans and specifications of the contract and, as a result, the trial court committed manifest error in finding that Aztec was liable to Bonomo for damages arising out of that mistake. The alleged mutual mistake was that Bonomo and Aztec confected their agreement under the belief that the pad was built of "sand," when, in fact, the pad was made of dirt containing silt. Aztec contends that a high silt content in the soil not only violated the specifications for the pad, but rendered it unsuitable for the project because of the propensity of silty soils to "pump" moisture. As previously stated, the pad was built by a third party subcontractor, B.J. Burnell, in a separate agreement with the owner.
To support its position that the plans and specifications for the warehouse foundation required a "sand pad," Aztec cites three references to the pad as a "sand pad" that are found in two exhibits introduced into evidence at trial. In the contract between Bonomo and Murphy ("Main Contract," Plaintiff's Exhibit 8), Article 2 states:
Site work, sand pad, drainage improvements, and parking lot improvements by F.J. Burnell [sic]. All other work listed is by Bonomo Builders, Inc. (Emphasis added).
The passage thus referred to work for which Bonomo would not be responsible, including the sand pad.
Next, Aztec cites two notations in the site plan drawings (Defendant's Exhibit 50) drafted by Smith and Raley, Inc., Consulting Engineers, the engineering firm that designed the project. Page C.3 consists of the drainage plan drawing and contains a notation with an arrow pointing to the building line on the pad surface which reads:
Note, build sand pad out past B.L. 5' 0" then taper @ 4:1 slope to natural grade. (Emphasis added).
Page S.2 of the foundation plan drawing contains the following notation in an area entitled "General Notes:"
2. All fill sand shall be 0-15 P.I. with a compaction test run on each 6" lift-compacted to 90% modified proctor. (Emphasis added).[1]
Additional support for its mutual mistake theory regarding the pad specifications comes from the testimony of Samuel Estis, president of Aztec, who testified that "[he] was told when we bid the job it was a nice sand pad." Estis stated that he considered this a positive feature because water runs through sand. He claimed that he would have bid the job differently, probably adding some money to account for liquidated damages for delay in completion of the project, had he known the *939 pad had a lot of silt and considering the season and time frame. Estis testified that he was told by Darrell Papenhausen, Bonomo's representative for the job, that the site condition was a "nicebeautiful sandy pad, out in the middle of a cow field." Estis said that he would also have "negotiated harder up front for access roads and that kind of stuff had he known the kind of material they were getting into.
Bonomo denies that there was any mutual mistake regarding the pad specifications and that the pad in this case met the requirements of the plans and specifications. It points to a provision in the letter proposal from Aztec, attached and made part of the Subcontractor Agreement. In that proposal drafted by Aztec, one section reads:

SCHEDULE OF QUALIFICATIONS:
* * *
(4) Base shall consist of compactable [sic], trimable, dense graded material. (Emphasis added).
Bonomo contends that the earthen pad meets the specifications of a compactible, trimable, dense graded material.
The first two uses of the term "sand pad" are not part of any specifications regarding the make-up of the pad, but merely references to the pad as a "sand pad." The third reference, however, refers to the specifications for the fill sand. The notation states that all "fill sand shall be 0-15 P.I."
We further observe that page C.3 of the site drainage plan drawings specify the source of the fill sand and the testing specifications. In the lower right hand of the page, the engineer's "NOTE" reads:
A. STRIP GRASS/ORGANIC MATERIAL FROM SITE
6"±
B. BEGIN FILL (FROM SITE ON BORROW PIT)-TO BE DETERMINED BY GEOTECHNICAL ENGINEER/TESTING LAB ENGINEER.
C. BEGIN FILL AT BUILDING (5'-0' PAST BUILDING LINE) AND TAPER TO EXISTING GRADE WITH 4:1 SLOPE.
D. COMPACT EACH 6' TO 8' LIFT TO 95% STANDING PROCTOR. ALL PASSING TEST WILL BE PAID BY OWNER. ALL FAILING TEST WILL BE PAID BY CONTRACTOR.
E. FINISHED PAD TO BE 10" BELOW FINISH FLOOR 143.50'
Ron Smith, founder of Smith and Raley, Inc., the consulting engineering firm hired by Murphy to design the project, testified that he was also hired by Murphy to monitor the construction of the pad by Burnell. Smith testified that the pad was built four to five feet high of select material compacted to certain specifications. A pad's purpose is to support the foundation. Smith stated that he assisted in finding the select fill material, "a zero to fifteen PI material sand" from borrow pits on the 160-acre site. He supervised the construction of the pad with CTL, a testing lab, and monitored the testing performed on each 8" lift.
With respect to the qualities of the pad called for by the specifications, Smith testified that the specifications required a pad consisting of a compact, gradable material with good bearing capacity. He stated that they had a compact specification of 95 percent standard proctor on this job. The pad material must also be trimablethat is, it must be capable of retaining its shape after trenches are dug or cut into the pad.
Elaborating on the material used to construct the pad, Smith rejected the description of the pad as "earthen" as too inclusive. He stated that the pad was more accurately called a "select fill pad" or "sand pad" because under the uniform classification of soils, the soil used in this pad, which had a zero to fifteen PI (plasticity index), was a sand classification. Smith *940 also explained that while this type of soil (sand) loses its compaction and bearing capacity when it becomes soaked with water, it has the desirable quality of regaining its compaction and bearing capacity when it drains. In fact, its compaction increases to 100%, he said.
Disputing Smith's testimony that the pad in this case met the plans and specifications, Aztec contends that the pad in fact did not meet the specifications of a "sand pad" because it did not drain the water caused by the heavy rains. Instead it became muddy, rutted, and it "pumped" when it became saturated with water. Using statements elicited at trial from engineers Ron Smith and Fred White regarding the phenomenon of "pumping,"[2] Aztec argues that the pad had a high silt content, retained moisture and acted like Jello when it became wet due to pumping.
Smith testified that when the pad was finished, Buster Netherton, the pad subcontractor,[3] put a very slight crown or grade on the pad so that it would drain rain water. At that point, said Smith, the pad would drain. However, Smith testified that this grade was not maintained, and the contractor selected the back or east side of the foundation to make the first 500' pour of a seven and one-half inch thick panel (slab), which subsequently acted as a dam for water attempting to drain off the pad. According to Smith, there was no work performed between March 7 and the end of the month due to rains and standing water on the pad. Bonomo instructed Aztec to "dewater" the pad using various methods such as hand pumps and sump pumps. On March 30, Smith went to the site and became upset when he observed ruts caused by trucks driven by Aztec personnel on the wet pad. He stated that the ruts prevented the pad from draining properly.
Gene Gardner, an engineer for Maxim Technologies, Inc. ("Maxim"), testified at trial as an expert for Aztec. Gardner generated a report ("Maxim report") for Murphy, rendering opinions regarding soils at the subject site for purposes of a foundation for the proposed warehouse prior to Murphy's decision to enter a contract with Bonomo for the warehouse construction. The following language is from page 5 of the Maxim report:
The soils generally encountered have a low susceptibility to shrink and swell with variations in moisture content. Consequently, the slab for the proposed structure can be placed directly on the prepared subgrade. If fill material is required at the site to achieve the desired elevation, it is recommended that a clayey sand or sandy clay be used.... The fill should be placed in lifts of eight (8) inches or less and compacted to a minimum of ninety (90) percent of the Modified Proctor Density (ASTM D-1557) (Emphasis added).
CONSTRUCTION PROCEDURES
The upper soils at the site are fine grained materials composed of a significant silt fraction. Silty soils are subject to extreme changes in shear strength with varying moisture conditions and, if construction is initiated during wetter *941 seasons of the year, it may be very difficult to move equipment about the site. Also, once silt becomes saturated, compaction operations can be seriously hampered by a tendency of the silt to "pump". Consequently, it is recommended that adequate site drainage be established prior to and continued during and following construction operations to prevent ponding of water on or adjacent to the construction area and subsequent saturation of the soil. Compaction operations may be expedited by using light compaction equipment and thin lifts of soil. Rolling only as necessary to obtain compaction is advisable because further repetitive loading may cause the subgrade to "pump". Once the silt begins to "pump", it generally becomes necessary to undercut the poor soil, waste it and replace it with controlled fill. (Emphasis added).
Gardner testified regarding the statements in the report quoted above. Gardner defined the terms "lift" as simply meaning a "layer," and he defined "subgrade" as the material below the lift ... "you would start out with no-no fill material on it." "The subgrade is the material that's there when you place the next layer on top of it." Gardner did not testify that the soil tested came from the borrow pit site used for the pad. He had never visited the site himself, having acquired soil samples from the undisturbed property before construction of the pad. He did not know if the samples came from the building site.
Gardner also testified regarding the properties of the three types of materials that make up a soil: sand, silt and clay. Regarding sand, Gardner stated that "[s]and is a coarse material, and it sort [sic] of defined as those materials that are larger thansmaller than a quarter inch and larger than one two-hundredths of an inch in diameter." It does not stick together and, "[i]n piles water will flow through it." Gardner acknowledged that there are many combinations of these three soil types, but he did not testify regarding their properties, except to note that the upper soils at the site were composed of a significant silt fraction, i.e., over thirty percent.
Aztec's position then, is that the pad was supposed to be constructed of sand, but inasmuch as rainwater did not flow through the pad as it contends it should have, it was not a "sand pad." Instead, due a high silt content, argues Aztec, the pad retained water and became Jello-like when saturated due to pumping of water from the subgrade when equipment was driven over it.
Based on the record, we conclude first that Aztec's argument that Bonomo and Aztec were mutually mistaken as to the construction material comprising the pad is without merit. Smith's testimony leads to the reasonable conclusion that the phrase "sand pad" is a technical term referring to a pad classification that consists of materials containing a certain level of sand properties, and a zero to fifteen PI (plasticity index) meets the sand classification. Aztec's position that the phrase "sand pad" required that the pad consist of sand alonein a sensepure sand, defined as materials that are smaller than a quarter inch and larger than one two-hundredths of an inch in diameter, is simply not tenable in light of the clearly written "fill" specifications. Even the Maxim report drafted by Aztec's expert witness, Gardner, recommended that the pad be constructed from "a clayey sand or sandy clay."
There is no doubt that the poor weather led to the saturation of the pad with water. The unrelenting wet weather coupled with the time pressures and contractual *942 delay damages unfortunately led to the breakdown in communications, and ultimately, Aztec's decision to walk off the job. The trial court concluded that Aztec's actions constituted a breach of contract.
Bonomo and Aztec are seasoned construction companies. Each visited the site and inspected the pad. It strains credibility to believe Aztec would not have recognized that the pad was unsuitable for the concrete foundation if, in fact, that was the case. The evidence in this record supports the conclusion Fred White, the subsequent contractor, used the same materials to repair the damaged pad, which indicates that the material used to make the pad was not the problem.
For these reasons, we conclude that the trial court did not err in concluding that the pad did meet specifications and in finding that Aztec breached its contract with Bonomo. The record also reasonably supports the trial court's findings, which Aztec did not specifically dispute on appeal, that Aztec was not justified for failing to communicate with Bonomo and abandoning the job, and therefore leaving the job uncompleted, resulting in damages sustained by Bonomo. Thorn v. Caskey, 32,310 (La. App.2d Cir.9/22/99), 745 So.2d 653. Although the poor weather was manifestly the greatest source of the problems Aztec encountered in performing its end of the contract, this court cannot undermine a contract simply because it was, as in this situation, a bad deal for one of the parties. Billingsley v. Bach Energy Corp., supra.
In its other assignment of error, Aztec contends that the trial court erred as a matter of law or committed manifest error in overruling its exception of failure to join a party under La. C.C.P. art. 641. The party Aztec alleges should have been joined is Murphy. Aztec argues that because it has no contractual privity with Murphy, it cannot sue Murphy ex contractu for damages it suffered as a result of Murphy's alleged breach of contract to provide its general contractor, Bonomo, with a pad meeting specifications. Accordingly, Aztec contends that Murphy must be joined as a party in order to share in liability for the allegedly defective "sand pad."
Because we conclude that the trial court was correct in reaching the conclusion that the evidence did not support Aztec's allegation that the pad did not meet the specifications, the question of whether Murphy should have been joined as a party to answer for a defective sand pad is moot. Accordingly, this assignment is without merit.

Conclusion
For the reasons stated herein above, the judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant.
AFFIRMED.
NOTES
[1] "PI" refers to "Plasticity Index." The plasticity index of a soil is the numerical difference between its liquid limit and its plastic limit. The liquid limit of a soil is that water content at which the soil passes from a plastic to a liquid state. The plastic limit of a soil is the opposite, that is, the lowest moisture level at which a soil remains plastic without crumbling. "Method of Tests for Plasticity Index of Soils." California Department of Transportation, Engineering Service Center. This index measures sensitivity to moisture change and is important when plans call for aggregate to be used in cement, asphalt and foundation construction.
[2] Smith explained in his testimony that there are several types of "pumping." Most familiar is the common phenomenon of bringing water to the surface of the ground by patting it with something such as your foot The other type of pumping involves making moisture saturated soil spongy and like Jello. (See also, Gardner's testimony). This latter type can occur by driving heavy equipment over soils susceptible to pumping.
[3] The record does not indicate Netherton's relationship as a principal or employee to the subcontractor of record for the pad, B.J. Burnell.