Judgment rendered November 20, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,946-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

PAUL JOHNSON                                Plaintiff-Appellant

versus

SHANNON IVERSON                             Defendant-Appellee

* * * * *

Appealed from the
Second Judicial District Court for the
Parish of Bienville, Louisiana
Trial Court No. 45,909

Honorable William R. Warren, Judge

* * * * *

ROSS LAW FIRM                               Counsel for Appellant
By: James E. Ross, Jr.

HAMPTON LAW FIRM, LLC                       Counsel for Appellee
By: Judith Layne Hampton-Kozik

* * * * *

Before PITMAN, ROBINSON, and MARCOTTE, JJ.

**ROBINSON, J.**

In this action to revoke an irrevocable *inter vivos* donation of immovable property from an uncle to his nephew, the uncle appeals the judgment denying his claim. For the following reasons, we affirm the judgment.

**FACTS**

Paul Johnson ("Johnson"), the maternal uncle of Shannon Iverson ("Iverson"), was born in 1951 and is the youngest child of his parents, who owned property located in Ringgold, Louisiana. In 1967, his parents constructed a new home ("the house") on the property. Iverson, who was born that same year, lived in the house for the first four years of his life with his mother, his maternal grandparents, and Johnson.

Johnson began paying the mortgage on the house after his father died in 1982. It took him ten years to pay the remaining balance of $15,000. He lived in the house off and on until his mother died in 1995. He moved to Baton Rouge in 1996 to work as a heavy equipment operator.

According to the parties, the property had been passed down through generations. There was a partition in kind of the property in 2009. Johnson received two tracts, including the tract with the house.

Johnson was diagnosed with cancer in 2015. Iverson came from his home in El Dorado, Arkansas, to check Johnson into the hospital and to stay with him. When Johnson was discharged from the hospital after a week, Iverson took his uncle back to his home in Denham Springs, Louisiana, before returning to El Dorado.

Johnson moved into Iverson's home in El Dorado in 2016. He was provided with his own room and meals. He did not pay rent or utilities, although he testified that he gave $200 to Iverson's wife each time that he received his check.

On June 10, 2016, Johnson executed a donation deed in which he donated the two tracts in Ringgold to Iverson. The deed stated that the donation was irrevocable and was for and in consideration of the love and affection which Johnson had for Iverson. The donation was executed before Farmerville attorney Judith Hampton.

Shortly thereafter, Johnson fell and injured himself after allegedly smoking synthetic marijuana with a neighbor. When Iverson learned of this, he told his uncle that he could not use drugs while living there. Believing that he was no longer welcome and feeling uncomfortable at his nephew's home, Johnson moved out.

On October 19, 2021, Johnson filed a petition to revoke the donation. He alleged that although the donation stated it was irrevocable, there was no meeting of the minds because at the time it was signed, he had no intention to make the donation irrevocable, he was not advised that the donation's language made the donation irrevocable, and he did not understand that the deed stated that the donation was irrevocable.

He further alleged that the donation failed for lack of consideration. He made the donation to show appreciation for Iverson helping with his care when he was ill. Further, Iverson breached their agreement by failing to keep the house in good repair, keep cows on the land, make periodic

2

monetary payments to Johnson, and to take care of Johnson's funeral expenses.

Johnson additionally alleged that Iverson had made verbal threats against him which caused him to fear that Iverson or a member of Iverson's family would harm him. He contended this cruel treatment amounted to ingratitude sufficient to revoke the donation.

Finally, Johnson alleged that Iverson helped Johnson while he was ill solely in an attempt to manipulate Johnson into giving the property to Iverson. Iverson knew or should have known that Johnson was under the influence of strong medicines when he signed the donation which he had not prepared. Johnson did not sign the donation with a full understanding that it was irrevocable.

In addition to the revocation of the donation, Johnson sought $50,000 in damages to repair the home because Iverson had breached his promise to do so.

*Trial*

A bench trial was held in this matter on July 7, 2023.

Paul Johnson testified that Iverson was one of his favorite nephews. He cosigned the loan for Iverson's first car. He recalled that after he returned home from the hospital, he saw Iverson in the audience at his Denham Springs church. Later that day, Iverson cried as he told Johnson that he had grandchildren. Johnson later learned that Iverson was experiencing marital problems. Iverson began calling Johnson on a regular basis and eventually convinced him to move to El Dorado, where he would live with Iverson, his wife, and two adult sons.

Johnson testified that Iverson came up with the idea of making a new will. He told his uncle that his prior will was not sufficient because it needed an accurate description of the property.

When asked whose idea it was to make the donation, Johnson responded that Iverson said he wanted the property to go to him, despite Johnson having a daughter. Johnson recalled an instance when Iverson tore up a photo of Johnson's daughter before he could see it, which he took as an example of Iverson not wanting anyone else to get close to him. Johnson desired to give the property to Iverson out of love and affection because he was a favorite nephew.

Johnson insisted that he did not call Hampton's office to prepare the donation. He also did not pay Hampton's fee. While he knew that Iverson's son was driving him to Farmerville to execute the donation, he did not see the donation before he arrived at Hampton's office. He recalled that once there, Hampton briefly explained some things. He claimed that the document was not read to him before he signed it. He did not read it himself before signing it. Johnson also claimed that one of the witnesses signed for the other witness who was absent.

Johnson understood that he was giving ownership of the land and minerals to Iverson. However, he did not know what irrevocable meant when he signed the donation, and he would not have signed it had he known what it meant. He did not intend for the donation to be irrevocable, and nobody explained to him that it was at the signing.

Johnson believed that Iverson and his family began treating him differently once Iverson received what he wanted. Although they never said

anything to make him feel uncomfortable or unwelcome in their house, he felt that way because Iverson and his son Seneca frowned or gave him angry looks when Johnson was around. In Johnson's view, he felt like he had been "kicked to the curb." He moved out of his own free will because of the way he felt treated there.

After the donation, Iverson gave away two horses belonging to Johnson that had been pastured on the property. The two horses, along with Iverson's horse, had escaped when a relative on adjoining property had removed a fence.

Johnson testified that Iverson sent him $100 on three occasions prior to the donation. Iverson sent $1,000 to Johnson after he moved out.

Johnson denied ever using any illegal drugs; however, he admitted to smoking marijuana during his life, although never at Iverson's home.

Johnson testified that he showed love to Iverson and expected the same in return, but did not receive it. He also expected Iverson to care for the property like he had done. He explained that he and Iverson had discussed that Iverson would do some things to take care of the property. However, he never gave Iverson a list of things that needed to be done.

Johnson testified that he spent time on the property after the partition and through 2015. Although the house is now in a state of disrepair, that was not the case prior to the donation. While the roof needed to be replaced, he considered the house to have been in a very livable, albeit not "comfortable," condition before the donation, and he asserted that two people lived there prior to 2015. The utilities were on and the property taxes were paid. Iverson had received $1,000 in timber proceeds before the

donation, and to Johnson's dismay, did not use the money to repair the house.

Johnny Davis, a carpenter from Arkansas, testified that Johnson asked him to prepare an estimate of the cost to repair the house. He went to the property in October of 2021, when he examined the house and took photographs, which were admitted into evidence. He estimated that it would cost $70,000 in labor and materials to make the house livable again.

Michael Bryant, a friend of Johnson's for more than 40 years, testified that Johnson is a truthful man who always tries to help loved ones. He learned about the donation from Iverson, who showed him the deed. While he never witnessed any verbal argument or physical fight between Johnson and Iverson, he believed that Johnson felt discontent at the way he had been treated.

Shannon Iverson testified that he and Johnson spent a lot of time together when he was growing up. Johnson is his favorite uncle, and Johnson said he was his favorite nephew. Iverson denied that Johnson cosigned a vehicle loan for him.

Iverson recalled that he told Johnson to write a will leaving the property to his cousins Tony and Roderick because they had grown closer to their uncle.

Iverson testified that about a month after Johnson's surgery, he moved his uncle to El Dorado because he was complaining that he was being mistreated in Denham Springs. Johnson was provided with his own room and three meals a day.

Iverson testified that they only discussed the Ringgold property when Johnson became angry because Roderick had messed up the property. He claimed that he did not ask Johnson for the property and told him to give it to Roderick or Tony, but Johnson said that he wanted him to have it. He accepted the property because it had sentimental value, and his grandparents had worked hard to pay for the land.

Iverson testified that Johnson made the call to set up the appointment for the donation. Johnson told him that he had gotten a lawyer. Iverson believed this occurred one or two months after Johnson had moved to El Dorado. He denied giving Hampton's name or phone number to his uncle.

Iverson denied that he and Johnson discussed repairing the house or that the donation came with conditions. He made no representations to Johnson that he would make any repairs. Johnson told him to keep the money from the timber sale, and he never intended to use that money to do anything to the house. He felt it was not his responsibility since Roderick had messed up the house. He has made no repairs to the house, and if he ever does it will be on his schedule.

Regarding what happened to the horses, Iverson testified that some horses that he and his uncle owned together escaped when an aunt had her fence removed. He eventually gave two horses to a neighbor so he would not have to worry about the horses getting loose on nearby roads and endangering motorists.

Iverson acknowledged that he never thanked Johnson for the donation. He thought Johnson lived in his home for six to eight months. He did not ask Johnson to leave his home in El Dorado, but merely told him not to use

drugs in his house. He thought Johnson left a week later. Iverson claimed that Johnson was using drugs at his house, and that he started using marijuana about two weeks after moving there. Johnson used it mostly in the garage. Iverson cited the incident with the synthetic marijuana as an example of his drug use. He also testified that he had seen marijuana in Johnson's possession as well as him using marijuana at Iverson's house. He added that he has seen his uncle use marijuana for the last 40 years.

Iverson described his uncle as being full of fun when he was not using drugs. They got along for the most part, and he never argued with or yelled at Johnson while he was living with him in El Dorado.

Tammy Williams has been a legal assistant for Hampton since March of 2016. She has 33 years of experience as a legal assistant. She witnessed the donation. She recalled that the other witness, Stacy Hunt, was present for the execution of the donation.

Williams testified that Hampton asked Johnson if he had any questions. She remembered that Iverson asked him if that was what he wanted to do and if he was sure because he had other relatives who could receive the property. Johnson replied that it was what he wanted to do.

Williams testified that Hampton explained to Johnson what he was signing, that there was no type of condition, and that he was making the donation solely out of the love that he had for Iverson. Hampton also explained that it was an irrevocable donation. Williams recalled that Hampton asked Johnson if he understood what he was signing and told him that it could not be undone. Williams added that she had never seen a donation at Hampton's firm where any conditions were placed on the donee.

8

She remembered Johnson verbally indicated that he understood what was going on and that he wanted to donate the property with the understanding that he could not have it returned to him. She could not remember if it was Iverson who hired them to facilitate the donation.

Stacy Hart has worked as a land abstractor for Hampton for 14 years. She was the second witness to the donation. She insisted that she was present if she signed it. Although she had no recollection of the donation execution, she explained that it is standard procedure for Hampton to go over the document, explain it, and make sure the parties understand what they are doing.

Hart testified that the deed indicated that Tammy Williams typed it and printed it. She added that although she did not know how Williams obtained Johnson's information, Williams could have gotten this information from one of the parties, from the parish courthouse where the property is located, or by checking online for a deed with the property description.

Hart believed that Iverson had been at Hampton's firm for business prior to the donation. She had no knowledge that Johnson contacted the firm about preparing the donation deed. She did not know who paid the firm.

Seneca Iverson is Iverson's older son. He was in his early 30s in 2016 when he lived at home with his parents, brother, and great-uncle. Johnson spoke with him about the donation. Johnson said he felt Iverson would be responsible, he (Johnson) was behind on his taxes, and he wanted to give it to Iverson. Johnson never indicated to Seneca that there were any conditions for Iverson to fulfill to receive the donation.

Seneca did not feel that being behind on taxes was Johnson's motive for making the donation. He drove Johnson to Farmerville for the donation. His understanding was Johnson set up the appointment, but he was not certain about that. He did not know his father had been a prior client of Hampton's firm.

Seneca was present when the donation was executed. He remembered that Hampton went through the paperwork thoroughly with Johnson, and she asked him multiple times if he understood what she was saying and if this was something that he wanted to do. Johnson answered in the affirmative multiple times and said he wanted to make sure the property went to "Sugar Pie," which was his nickname for Iverson.

Seneca thought that he had a great relationship with Johnson as they spent a lot of time together. He never saw an exchange of harsh words between his father and Johnson. Seneca testified that after Johnson fell in the front yard and hurt his head, he learned from a neighbor that Johnson had been smoking synthetic marijuana which he had obtained from the neighbor. Johnson had blood above an eyebrow and on his arm. His mother asked Johnson if he wanted her to bring him to the hospital, but he declined and said he was fine. When his father returned home from work, he told Johnson that he would have to leave if he could not stop using drugs. Seneca had seen Johnson smoke marijuana a few times at a barn located five to ten miles from their house. Those were the only times that he saw Johnson smoke marijuana.

Seneca thought Johnson left a couple of weeks after the incident concerning the synthetic marijuana. Iverson was on the road working as a truck driver when Johnson left.

Shaquille Iverson, Iverson's younger son, was 24 when he lived with his family in 2016. He thought that Johnson was treated well, and he never witnessed any cruel treatment or a verbal or physical altercation between Johnson and his father. He never saw Johnson doing drugs at their house. He was not sure why Johnson moved out, but it happened shortly after his father spoke with Johnson about doing some unacceptable things at the house. Asked if he had ever seen Iverson maliciously or intentionally cause Johnson any harm, he answered that all he saw was his father trying to help all his family members.

At the close of evidence, Hampton put on the record that she was the attorney and notary on the donation deed. Iverson waived any conflict created by her representing him. Iverson also acknowledged that she had suggested another attorney to represent Iverson in this lawsuit.

The trial court rendered judgment in favor of Iverson, concluding that the donation was valid and was not revoked. The court noted that Johnson claimed the donation should be revoked on account of ingratitude for: (1) failing to maintain the property or make repairs; (2) failing to thank Johnson for the donation; (3) evicting Johnson; and (4) accusing Johnson of doing drugs. The court concluded that Johnson was not evicted from Iverson's home and that the remaining claims made by Johnson did not rise to the level of ingratitude that could give cause to revoke the donation.

**DISCUSSION**

Johnson, who has new counsel on appeal, argues that the trial court committed manifest error in failing to consider the issue of Hampton's conflict of interest. Johnson further argues that the trial court committed manifest error in failing to revoke the donation based on ingratitude.

*Conflict of interest*

Johnson testified that he did not know Hampton, he did not see the donation before arriving at her office, he did not understand what he was signing, and he would not have signed it had he known the donation was irrevocable. Iverson testified that Johnson set up the appointment with Hampton. Iverson had been a client of Hampton in other matters before the donation.

Johnson argues that Hampton had a conflict of interest under Rules 1.7 and 8.4 of the Rules of Professional Conduct that was not addressed by the trial court and is a ground for setting aside the donation. He contends that he would have declined the services offered by Hampton had he known that Iverson had been a prior client and that she was working for Iverson at the time of the donation when she was representing Johnson's interest. He maintains that setting aside the donation is the only reasonable action to take since Hampton never obtained a waiver from him of the conflict of interest.

We first note that this issue was not addressed by the trial court because it was not raised at trial by Johnson's trial attorney and is urged for the first time on appeal by new counsel. As a general rule, appellate courts will not consider issues raised for the first time in this court, which are not pleaded in the court below and which the district court has not addressed.

12

*Geiger v. State ex rel. Dept. of Health and Hosp.*, 01-2206 (La. 4/12/02), 815 So. 2d 80.

Furthermore, whether or not Hampton had a conflict of interest, it did not affect the validity of the donation. Signatures to obligations are not mere ornaments. *Tweedel v. Brasseaux*, 433 So. 2d 133 (La. 1983). The law of Louisiana is that one who signs an instrument without reading it has no complaint. *Id*. It is well settled that a party who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, that he did not understand it, or that the other party failed to explain it to him. *Aguillard v. Auction Management Corp.*, 04-2804 (La. 6/29/05), 908 So. 2d 1.

Johnson was aware of what he was doing when he made the irrevocable donation. The donation, which Johnson willingly signed, stated it was irrevocable. Witnesses testified that the nature of the donation was explained to Johnson. This argument is without merit.

### Ingratitude

Johnson contends that Iverson's ingratitude was shown by his plot to defraud Johnson of his property and then falsely accuse him of using drugs to get him out of his El Dorado home.

A donation *inter vivos* may be revoked because of ingratitude of the donee. La. C.C. art. 1556. There are two grounds for revocation on the basis of ingratitude. The first is if the donee has attempted to take the life of the donor. The second is if the donee has been guilty towards the donor of cruel treatment, crimes, or grievous injuries. La. C.C. art. 1557.

Grievous injuries sufficient to revoke a donation have been defined as any act naturally offensive to the donor. *Porter v. Porter*, 36,007 (La. App. 2 Cir. 6/12/02), 821 So. 2d 663. Cruel treatment or grievous injury sufficient to revoke a gratuitous donation may include adultery by a spouse, seizing property belonging to a parent, filing suit against a parent alleging criminal activity, and slandering the memory of the donor. *Id*.

The trial court was not manifestly erroneous in concluding that the evidence did not establish the level of ingratitude sufficient to revoke the donation. Iverson opened his home to Johnson, who was offered room and board and was not expected to pay rent, for food, or for utilities. Apparently, the only condition to live there was that Johnson did not use drugs. Johnson decided to move out because he felt uncomfortable by how Iverson and Seneca looked at him, and because he felt that Iverson did not reciprocate his love. While it is unfortunate that their once close relationship is now strained, hurt feelings in this instance do not rise to the level of cruel treatment or grievous injuries sufficient to revoke this donation.

## CONCLUSION

At Johnson's costs, the judgment is AFFIRMED.