SAVOIE, Judge.
This case arises out of a contract for the construction of a large metal warehouse building on a concrete slab. On May 2, 1977, while a portion of the slab was being poured, it began to rain heavily so the unfinished slab of concrete was covered over with plastic sheets and left for the night. By morning, when the rain had stopped, the concrete had hardened. Some portions had been washed away by the rain and there were irregularities in the texture and levelness of the remaining surface. It will be necessary to describe the intervening events in some detail but it is enough to say now that the slab was rejected by the owners and work was shut down on the project for several weeks until ultimately a new cement sub-contractor overlaid the objectionable slab.
The general contractor, L. W. Farris, Inc. (Farris) recovered damages in the amount of $19,907.61 against the original cement sub-contractor, Hughes-Turner Construction Co., Inc. (Hughes-Turner), based on the trial court’s finding that the slab had a defective surface which could not be satisfactorily repaired. Farris’ claim against the owners (TRW Co.) was dismissed. By this appeal, Farris attacks the money judgment in his favor against Hughes-Turner, arguing that the slab was not so defective as to justify the owners’ rejection of it, and that the owners, therefore, should pay his damages which, he alleges, are much greater than $19,907.61. Only in the case that this court upholds the finding below that the slab was defective does Farris defend the judgment he now possesses against Hughes-Turner, in which case he asks that it be increased.
On May 2, 1977, acting against the advice of the general contractor and the owners’ representative, who said that the weather report predicted rain, the cement sub-contractor on the job, Hughes-Turner, poured a section of cement slab, their work being interrupted in mid-afternoon by the onset of heavy rain which continued throughout the night.
Next morning, an attempt was made to put a smooth finish on the surface of the slab by grinding it with a mixture of sand and concrete and water. But the owners’ representative on the job, Mr. Benjamin Franklin Hayes, told the Hughes-Turner people that they were wasting their time because he would not accept the slab finished in that manner — that they must either tear out the slab and start over or suggest an acceptable alternative method of repair.
It was shown at trial that Mr. Hayes does not have an engineering degree and had limited experience with cement work prior to this job. He had worked on a project in Alaska where the surface of a repaired slab crumbled under heavy use and this was the basis of his initial opinion that the grinding method used by Hughes-Turner would not produce a strong enough bond to the existing concrete to support a surface durable under the heavy use expected for a warehouse floor.
There was positive testimony from Dean McKee of the L. S. U. Engineering School that it is not at all unusual in climates such as we have in Baton Rouge for unfinished cement slabs to be rained on. He testified that “there are floor hardeners, finishing compounds, these epoxy-type compounds, anything that can be put on the surface to give you good, durable wearing surface.”
He testified, however, that the quality of the bond between the new surface and the old would depend on the skill of the cement finisher, and when shown photographs of the repairs actually attempted' by Hughes-Turner, he testified that it was plain that a good bond had not been obtained and that the work was “not acceptable”.
*617 At any rate, two days after the pour, Ben Hayes formally rejected the sand, dry cement and water method of repairing the slab and demanded that Farris “remove the rejected slab of concrete as soon as possible or furnish me with an alternate recommendation that will meet standard construction specifications as well as my own approval.” (Ex. P-4)
By letter of May 17th, Hughes-Turner formally proposed use of a liquid floor hardener. (Ex. P-51) But on May 24, Mr. Tricou, one of the owners, was still demanding removal of the whole slab. (Ex. P-71)
Initially, it appears that the general contractor supported the position of Hughes-Turner, that the slab did not need to be replaced. As late as June 8th, more than a month after the pour, Farris maintained that the slab was acceptable. (Ex. TRW-9) However, on June 13th, the results of core tests conducted on the slab by Shilstone Testing Laboratories became available to the parties and these were interpreted by Farris (quite erroneously, it now appears) to show that the slab was too weak for its intended purpose. (Ex. TRW-1) This report changed the position of Farris, which, by letter of June 15, acknowledged the slab was defective. (Ex. TRW-4)
Dean McKee’s testimony contains a lucid explanation of the meaning of the test just mentioned and it does not appear that any party to this litigation now seriously maintains that the slab was not strong enough. Complaints about the slab are now limited to its surface characteristics and Farris has returned to its earlier position that the slab could have been repaired.
Following the June 15th letter, however, Hughes-Turner was effectively off the job. Another cement contractor was brought in who overlaid the existing slab and the warehouse has been completed and is occupied by its owners. The decision to overlay the slab rather than make further attempts to repair its surface cannot be conscionably attacked by Farris now, since that decision was Farris’ own suggestion, stimulated, apparently, by its own mistaken interpretation of the Shilstone report. Hughes-Turner, which would be in a better position to contest this point, has not appealed the judgment against it. We decline to find the owners liable to their general contractor for actions taken with that contractor’s concurrence. In this posture of the case, the district court’s finding that the surface of the slab was defective and could not be repaired is not erroneous.
Similarly, we affirm the district court’s finding that damages for lost profits and loss of business reputation were not proven. The only witnesses on these subjects were L. W. Farris, himself, and his son-in-law. It appears that the son-in-law obtained several contracts which, he said, Farris would have obtained and would have made a profit on were it not for the loss of bondability caused by being put in default on this project. There is no way to tell whether he would have had these jobs or not and no way to tell whether, obtaining them, he would have profited by them. The son-in-law acknowledged that, though not the general contractor, Farris had worked, and presumably been paid, on some of these very projects.
Any loss of profits is purely speculative. There was no responsible testimony supporting any loss of business reputation.
Costs will be taxed to the appellant.
AFFIRMED.