830 So.2d 480 (2002)
Marvin SIMPSON and Sharon Simpson d/b/a Simpson's One Stop, Plaintiffs-Appellees
v.
RESTRUCTURE PETROLEUM MARKETING SERVICES, INC., Defendant-Appellant.
No. 36,508-CA.
Court of Appeal of Louisiana, Second Circuit.
October 23, 2002.
*481 Michael Stephen Coyle, Ruston, Michael R. Phillips, Harahan, Michael Hodgson Pinkerton, for Defendant-Appellant.
Johnny E. Dollar, Monroe, for Plaintiffs-Appellees.
Before BROWN, GASKINS and CARAWAY, JJ.
CARAWAY, J.
The gasoline supplier for plaintiffs' convenience store was required to shut down its gasoline facilities to upgrade the facilities for environmental regulations. Plaintiffs sued for breach of contract for the lost profits and other damages to their business. The jury determined that the defendant breached its contract in bad faith and awarded damages for lost profits, property restoration, loss of business reputation and mental anguish, and the defendant appeals. For the following reasons, we reverse in part and affirm in part.

Facts
Simpson's One Stop is a gas station/convenience store owned and operated by Marvin and Sharon Simpson. The Simpsons had a written contract (hereinafter the "Contract") with Restructure Petroleum Marketing Services, Inc. ("Restructure") whereby Restructure provided *482 motor fuel at Simpson's One Stop. The Contract was originally entered into by the parties' predecessors on May 3, 1985, with an expiration date of March 9, 1992. In 1989, the Contract was amended and the new term of the Contract was from September 1, 1989 to August 31, 1999. Upon the expiration date of August 31, 1999, Restructure could remove all of its equipment within 90 days.
Restructure owned and maintained all of the equipment associated with storing and dispensing the fuel, including the fuel tanks and pumps. The Simpsons allowed Restructure the use of its property and received a commission from the sale of all fuel.[1] In 1988, regulations were passed by the Department of Environmental Quality ("DEQ") requiring upgrades to fuel dispensing equipment. The DEQ permitted all owners of fuel dispensing facilities a period of ten years within which to bring those facilities into compliance with the environmental regulations to prevent soil contamination. Under the provisions of the legislation, Restructure was required to upgrade its facilities by December 22, 1998. If the upgrades were not made by then, no fuel could be dispensed from that property and the non-compliant equipment had to be removed within one year from December 22, 1998.
The Contract, under the section entitled "Insurance, Taxes, Permits, and Licenses," states in pertinent part that: "All permits, authorizations and licenses required for the selling of its motor fuel shall be the responsibility of [Restructure]."
There is no evidence that the Simpsons or their predecessors had knowledge of the DEQ regulations when they became obligated under the Contract. After learning of the regulations, Mr. Simpson testified that he wrote the following letter to Restructure in July 1998:
At this time, I am trying to plan for the future of my business and am held back due to the fact that there has to be Cathotic (sic) Protection work done on equipment at my location by December of 1998. I have decided not to renew our Contract expiring Aug. 1999 and again at that time my location would be disrupted by removing equipment from our location. Construction work being done in less than seven months, would surely be costly to the both of us. I am asking if it would be in our best interest to terminate our contract as soon as possible to avoid us any unecessary (sic) expense and downtime. Providing exit from our location by you meets EPA ground approval.
Restructure later responded to that letter requesting a five-year extension of the lease. On October 21, 1998, Mr. Simpson spoke to Restructure's president, Jack Ceccarelli, on the telephone and they discussed an early termination of the Contract.[2] Mr. Simpson stated that he was not satisfied with the way Restructure had maintained the equipment and he did not intend to renew the lease.[3] According to Mr. Simpson, however, the termination of the Contract did not occur. Mr. Ceccarelli did not testify at trial, but Restructure contends that it thought that there was an agreement of early termination.
Mr. Simpson further testified that he continued, unsuccessfully, to make contact *483 with Restructure regarding a potential early termination of the Contract. On December 7, 1998, Steve Cagle of C & J Pump, Inc. ("C & J") prepared a quote to Hill Oil Company concerning the installation of new fuel tanks and pumps at the Simpsons' store. Also, on December 11, 1998, C & J prepared a quote to Restructure concerning the removal of Restructure's equipment from the Simpsons' property.
Since the upgrades to the existing equipment were not made, Restructure's employee, Harold Constance, locked the equipment on December 22, 1998 so that no fuel could be dispensed. Mr. Constance then requested the amount due for sales for that month and asked Mr. Simpson to sign a document entitled "Notice of Mutual Termination." Mr. Simpson refused to sign that document.
On January 4, 1999, the Simpsons' attorney sent a letter to Restructure advising them that damages were being sustained as a result of its breach of the contract and that Restructure could remove its equipment subject to the Simpsons retaining their claims for breach of contract. Restructure responded through its attorney, stating that Mr. Simpson had arranged to do business with another supplier and that it was releasing the Simpsons from the Contract. That letter further stated that Restructure had received regulatory approval to dispense fuel from those tanks until the upgrades were complete. On January 21, 1999, the Simpsons' attorney responded to that letter and requested a copy of the regulatory approval and again notified Restructure of the damages being sustained by the Simpsons. At trial, Mr. Simpson testified that he did not have an agreement with another fuel supplier on December 22, 1998, and that no one from Restructure had ever told him that they had obtained regulatory approval to dispense fuel after that date.
In January of 1999, C & J began removing Restructure's equipment from the Simpsons' property. The removal of the equipment was completed by February 16, 1999. After Restructure's fuel tanks were removed, the holes were back-filled by C & J. Thereafter, the Simpsons laid asphalt over the area for parking. Subsequently, that area of asphalt began to cave in. The Simpsons seek damages for the cave-in.
The Simpsons entered into a new contract with Hill Oil Company to provide for their fuel services. Hill Oil Company had new tanks and pumps installed by C & J in a different location on the property. Fuel sales resumed on April 13, 1999.
The jury found that Restructure breached the Contract in bad faith and awarded the following damages:
$36,519 in lost profits;
$23,650 in restoration damages;
$80,000 for loss of business reputation;
$50,000 for mental anguish.
The trial court entered judgment for those amounts and Restructure appeals.

Discussion
Restructure's assignments of error and arguments to this court significantly do not clearly articulate that it did not breach the Contract. Instead, Restructure disputes that it breached the Contract in bad faith and contests the damage awards. The breach of Contract that Restructure tacitly concedes can be viewed generally as resulting from Restructure's failure to meet its obligation to provide fuel pumping facilities upgraded in accordance with the DEQ regulations for the complete term of the Contract. On December 22, 1998, eight months before the Contract would terminate, Restructure shut down and then removed its pumping facilities, thus *484 depriving the Simpsons of gasoline for their business. This was caused by Restructure's failure to remain in compliance with DEQ regulations. We therefore determine that a breach of contract did occur and will address Restructure's arguments concerning the amount of damages, the nature of the damages, and the issue of the bad faith breach as determined by the jury.
An appellate court may not set aside a jury's findings of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State, through Dept. of Transp. and Dev., 617 So.2d 880 (La.1993). A reviewing court must do more than simply review the record for evidence which supports or controverts the trial court's findings. It must review the record in its entirety to determine whether the trial court's findings were clearly wrong or manifestly erroneous. Also, the reviewing court must ascertain whether the fact finder's conclusions were reasonable. Even when an appellate court may feel that its own evaluations are more reasonable than the fact finder's, reasonable determinations and inferences of fact should not be disturbed. Porter v. Porter, 36,007 (La. App.2d Cir.6/12/02), 821 So.2d 663. Where there are two permissible views of evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, supra.
An obligor is liable for the damages caused by his failure to perform a conventional obligation. La. C.C. art.1994. Damages are assessed by the loss sustained by the obligee and the profit of which he has been deprived. La. C.C. art.1995. An obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made. La. C.C. art.1996.
Restructure claims that the trial court erred in awarding the Simpsons $36,519 in lost profits. Loss of profits must be proved with reasonable certainty and cannot be based on speculation or conjecture. Clark v. Ark-La-Tex Auction, Inc., 593 So.2d 870 (La.App. 2 Cir. 1992), writ denied 596 So.2d 210 (La.1992). Furthermore, a claim for lost profits cannot rest solely on the testimony of the injured party without being substantiated by other evidence. New Orleans Riverwalk Assoc. v. Robert P. Guastella, Inc., 94-2092 (La.App. 4 Cir. 11/16/95), 664 So.2d 151; writ granted, 96-0199 (La.4/8/96), 671 So.2d 327.
Initially, for the calculation of these damages, we reject Restructure's argument that three weeks of the shutdown time, which was the minimum amount of time to upgrade or remove the fuel facilities, was not time which could be used to calculate damages for the breach. All of the shutdown time which elapsed during the term of the Contract constitutes the period of the breach.
In corroboration of Mr. Simpson's testimony concerning lost profits, business records from 1998 and 1999 were introduced into evidence. Those records indicated that the average daily commissions that the Simpsons received from the sale of fuel before the breach was $65.10. Since the Contract was to expire on August 31, 1999, the Simpsons claimed 249 days (the number of days between December 22, 1998 and August 31, 1999) in lost commissions or $16,209.90 ($65.10 × 249). They next subtracted from that amount, $6,022.83, the amount of all commissions from the sale of fuel received from Hill Oil Company between the dates of April 13, 1999 and August 31, 1999, thus calculating their lost profits from the sale of fuel in the amount of $10,187.07.
The jury also awarded the Simpsons $26,331.90 for lost profits from inside sales. *485 Mr. Simpson testified that customers who purchased gasoline usually purchased items from inside the store as well. He further testified that inside sales immediately dropped after the December 1998 shutdown and the business records introduced at trial showed that the Simpsons' profits from inside sales were approximately $26,331.90 less in 1999 than they were in 1998. There was no evidence offered showing any other significant change in the Simpsons' business to explain the loss of profits from inside sales. We find, therefore, that the jury was not manifestly erroneous in finding that Restructure's breach directly caused a $26,331.90 loss of profits from the inside sales.
Restructure next argues that the trial court erred in awarding restoration damages in the amount of $23,650. Despite the unique relationship of the parties' obligations under the Contract, the Contract was labeled as a lease, and the jury was instructed regarding the lessee's obligation to restore the premises. The Louisiana Civil Code requires a lessee to return the leased premises in the same condition, as follows:
If an inventory has been made of the premises in which the situation, at the time of the lease, has been stated, it shall be the duty of the lessee to deliver back everything in the same state in which it was when taken possession of by him, making, however, the necessary allowance for wear and tear and for unavoidable accidents.
La. C.C. art. 2719. The Louisiana Civil Code further states the following:
If no inventory has been made, the lessee is presumed to have received the thing in good order, and he must return it in the same state, with the exceptions contained in the preceding article.
La. C.C. art. 2720.
John Maroney, an expert in the field of civil engineering, testified that the area had not been restored to its prior condition. It was his expert opinion that the natural soil in that location was a reddish iron-ore, but that and had been used to back-fill the hole. He further stated that the ground had not been compacted properly. Those two factors caused the parking lot to sink. Restructure offered no evidence to rebut Mr. Maroney's testimony.
Although the Contract was silent as to Restructure's duty to restore the Simpsons' premises to its normal condition, we find that Restructure had a legal duty to restore the property. Since Mr. Maroney's opinion was not controverted, we conclude that the jury was not manifestly erroneous in awarding the Simpsons $23,650 in restoration damages.
The third and fourth elements of damages were presented to the jury contingent upon a finding of a bad faith breach of contract. The final jury interrogatory read as follows:
If you find that the breach of the Contract by defendants was in bad faith, please state an amount that you find the plaintiffs are to receive next to each of the below listed items (assign dollar amounts, but if awarding "0", fill in "0")

 A. Damage to business reputation $80,000.00
 __________
 B. Mental anguish/emotional trauma/
 Loss of enjoyment of life:
 a. as to Marvin Simpson $30,000.00
 __________
 b. as to Sharon Simpson $20,000.00
 __________

Restructure now contests these findings by the jury, claiming that it was not in bad faith, that no evidence of lost business reputation was proven, and that mental anguish damages are unwarranted.
The disputed final jury interrogatory and the findings by the jury involve a mixture of two concepts addressed in Civil *486 Code articles 1997 and 1998, which provide as follows:
Art.1997. Obligor in bad faith. An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform.
Art.1998. Damages for nonpecuniary loss. Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.
Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.
These articles clearly involve two separate characteristics concerning the foreseeability of the damage and the pecuniary/nonpecuniary nature of the damage.
The jury made no finding regarding the foreseeabilty of these last two items of damages, and whether those damages are pecuniary or nonpecuniary in their nature can be addressed as a matter of law. We will therefore first address the characterization of the business reputation and mental anguish damages in this case under Articles 1998 and 1999.
Business reputation is synonymous with goodwill. See Karageorge v. Cole, Jr. et al., 565 So.2d 502 (La.App. 2 Cir.1990). Goodwill is the value of a business over and above the value of its physical property. Karageorge, supra, citing Succession of Jurisich, 224 La. 325, 69 So.2d 361 (1953). In seeking damages for loss of business reputation, a business must prove that it had a good reputation. Mahfouz v. Ogden, 380 So.2d 646 (La.App. 1 Cir.1979). Next, the plaintiff must show how the business reputation was affected to his detriment. Koncinsky v. Smith, 390 So.2d 1377 (La.App. 3 Cir.1980). Further, outside testimony is needed to prove that a business reputation was damaged. See Lawrence W. Farris, Inc. v. Hughes-Turner Construction Co., Inc., 413 So.2d 615 (La.App. 1 Cir.1982).
The manner of proving a loss of business reputation as indicated by the jurisprudence requires a review of business accounting records to measure the loss to the business. The loss should also be established by the testimony of customers and other parties who had dealings with the business. Although the loss cannot be established precisely, it affects an economic interest which partially comprises the value of the business and is therefore a pecuniary loss. See, Revision Comments (b), La. C.C. art.1998.
Regarding the foreseeability of the loss of business reputation, we find that given the nature of the Contract and the manner in which Restructure breached the Contract, the loss was foreseeable. The Simpsons' convenience store business required the sale of gasoline to attract customers to the business. The inconvenience caused by the extended shutdown of the gasoline business could cause not only an interim loss of profits, but a loss of business reputation. This potential for loss was reasonably within the contemplation of the parties to the Contract.
Accordingly, we find that recovery for the loss of business reputation in this case was not dependent upon whether the breach of contract was in bad faith. Nevertheless, from our review of the record, we find no evidence indicating a loss of business reputation. After the initial period of lost revenues and business discussed above, the Simpsons' business, as reflected *487 in the gasoline sales data, had fully recovered by September of 1999. There was no testimony presented, other than that of the Simpsons, which indicated the business lost customers permanently because of the three to four month interruption of the gasoline service. We therefore find that the Simpsons' business loss was fully compensated by the jury's award for loss of profits and reverse the award for damages to the business reputation.[4]
The jury's award of mental anguish damages is a nonpecuniary loss which is governed by La. C.C. art.1998. Young v. Ford Motor Co., Inc., 595 So.2d 1123 (La.1992). In Nolan v. Commonwealth Nat. Life Ins. Co., 28,777 (La.App. 2 Cir. 11/1/96), 688 So.2d 581; writ denied, 97-0490 (La.4/18/97), 692 So.2d 449, this court had occasion to review La. C.C. art. 1998 and its codal history. In Nolan, the trial court also found a bad faith breach of contract and awarded nonpecuniary damages. This court discussed the distinction between Article 1997 and 1998, as follows:
Nonpecuniary damages, which had as their source Article 1934(3), are damages for mental anguish, inconvenience, humiliation and embarrassment. These damages certainly would appear to have relevance to a bad faith breach particularly since, as explained by the drafters of new Article 1998, nonpecuniary loss in civilian doctrine is "damage of a moral nature which does not affect a `material' or tangible part of a person's patrimony." Comment (d), Revision Comment-1984; C.C. art.1998, citing Litvinoff, "Moral Damages," 38 La.L.Rev. 1 (1977). Nevertheless, the remediation of moral damages does not appear to be the focus of Article 1997, but instead is addressed under La.C.C. art.1998 and may result irrespective of bad faith under the circumstances described therein. See Young v. Ford Motor Co., Inc., 595 So.2d 1123 (La.1992).

* * *
Consequently, there appears to be no case indicating that the unforeseeable damages allowable under former Article 1934(2) for a bad faith breach included unforeseen, nonpecuniary loss or prejudice sustained by the obligee. Article 1997, which has taken the place of Article 1934(2), does not reflect a change in the law.

* * *
More significantly, as emphasized by the revision comment for Article 1998, "mere worry or vexation is not a compensable nonpecuniary loss." Comment (e), Revision Comment1984. Elston v. Valley Elec. Membership Corp., 381 So.2d 554 (La.App. 2 Cir.1980). Such frustration and worry is always present and therefore foreseeable with every breach of contract, and until it rises to a more substantial level, it is viewed as a risk accepted by the parties in contracting.
Id. at 584-585.
Nolan determined that a bad faith breach under Article 1997 extends recovery for damages to unforeseeable, pecuniary losses, but not nonpecuniary losses. Nevertheless, Nolan also had to explore whether the finding of bad faith in that case stemmed from the intentional breach by the defendant "to aggrieve the feelings *488 of the obligee." If so, the nonpecuniary award for mental anguish which was awarded by the trial court in Nolan could have been an appropriate damage remedy under the second sentence of Article 1998.
In this case, our review of the record indicates that the jury's finding of a bad faith breach of the Contract by Restructure is questionable. After Mr. Simpson learned that the DEQ regulations would require a shutdown to upgrade the pumps, Mr. Simpson proposed that the Contract simply be ended in December 1998, eight months before the termination of the Contract. Mr. Simpson later had a conversation concerning his proposal with Mr. Ceccarelli in October 1998, and Mr. Simpson's testimony of that conversation was as follows:
Question: Right. Okay. And so you talkedyou presented that proposal to Mr. Ceccarelli, did you not?
Answer: I did.
Question: You say here, Mr. Ceccarelli said that the offer sounded acceptable to him and that that offer was your offer? Is that correct?
Answer: Yes, sir.
Question: Which was to terminate the Contract effective December 22, have them remove their stuff by December 22, is that correct?
Answer: Not all of it.
Question: No, that's not correct?
Answer: No, sir. I had upon stipulation that they remove their equipment and the ground passes DEQ examination.
Question: Right. The ground passed the inspection, that was the other stipulation. Is that correct?
Answer: Correct.
Question: And anything else?
Answer: If they met those stipulations, remove their equipment and pass DEQ I would entertain the idea of ending that Contract.
Question: And did Mr. Ceccarelli accept your offer?
Answer: He said he did.
In keeping with the Simpsons' proposal to terminate the Contract, Restructure contacted C & J and requested a quote for removing the equipment from the Simpsons' property on December 11, 1999. Restructure verbally agreed to have C & J remove the pumps and fuel tanks shortly thereafter. Likewise, Mr. Simpson had begun negotiations with Hill Oil Company in early December, anticipating the removal of Restructure's equipment.
Under these circumstances, while we find Restructure's communication with Simpson lacking and the delay in removing its facilities questionable, we do not find evidence that Restructure was deliberately attempting to force the Simpsons into extending their Contract with Restructure or to punish the Simpsons for their refusal to extend the Contract. Instead, a third party to this dispute, Mr. Cagle, explained his delay in the removal of Restructure's facilities and the installation of Hill Oil Company's as due to the backlog of his work caused by the DEQ deadline.
More specifically, we do not find that Restructure intentionally acted to aggrieve the feelings of the Simpsons. The Simpsons' feelings were no doubt aggrieved by the fact of Restructure's admitted breach of contract which caused their business to be without gasoline service. Yet, the shutdown of business during the term of the contract was inevitable because of DEQ regulations. Whether the shutdown came in a timely fashion before December 22 in accordance with Mr. Simpson's desires, or afterward in a somewhat tardy fashion, the Simpsons were going to be aggrieved and inconvenienced by Restructure's breach of contract. *489 Ordinary damages for lost profits arose and have been awarded in this case. Nevertheless, Restructure was not shown to have deliberately intended to embarrass and frustrate the Simpsons in the conduct of their business. Accordingly, the jury's award for mental anguish damages under Article 1998 is reversed.

Conclusion
The trial court's judgment awarding $36,519 for lost profits damages and $23,650 for restoration damages is affirmed. The judgment for loss of business reputation and mental anguish damages is reversed. Costs of appeal of assessed equally to the parties.
AFFIRMED IN PART, REVERSED IN PART.
NOTES
[1] The Contract is labeled as a "lease" between the parties.
[2] Restructure would benefit from the early termination because it would relieve it of having to perform costly upgrades.
[3] The plaintiffs claim that the equipment frequently malfunctioned because it was improperly maintained.
[4] The measure of the lost profits as reviewed above extended to the time period between April 13, 1998, when gasoline sales resumed, and the end of the term of the Contract in August. The financial data for that period, after gasoline sales resumed but before the level of business was restored, demonstrated business loss due to customer relations damaged during the shutdown.