882 So.2d 639 (2004)
Bobby Ray JARRELL, Plaintiff-Appellee
v.
Leo A. MILLER, Jr., et al., Defendants-Appellants.
No. 38,360-CA.
Court of Appeal of Louisiana, Second Circuit.
September 9, 2004.
*641 Hayes, Harkey, Smith & Cascio, L.L.P., by Joseph D. Cascio, Jr., John C. Roa, The Boles Firm, by Robert W. Kostelka, Monroe, for Defendants-Appellants, Leo A. Miller and Westport Insurance Co.
Crawford & Anzelmo, by Brian E. Crawford, McLeod Verlander, by David E. Verlander, III, Monroe, for Plaintiff-Appellee Bobby Ray Jarrell.
Before BROWN, WILLIAMS, GASKINS, CARAWAY, and DREW, JJ.
BROWN, C.J.
This is an attorney malpractice action. Plaintiff, Bobby Ray Jarrell, argued that he "suffered immense economic harm as a result of Miller's misconduct and negligence in handling the broad scope of duties accepted by [Miller] as Mr. Jarrell's attorney." Jarrell claimed special damages for the loss of his job and stock in the company he and his wife of 27 years founded *642 and operated.[1] He also sought general damages for emotional distress. A jury agreed with plaintiff and awarded him a total of $1,350,285. Defendants, the attorney, and his malpractice insurer have appealed. For the reasons set forth below, we reverse and render judgment in favor of defendants.

Facts
Plaintiff and his wife, Maxine Ford Jarrell, were the sole shareholders and officers of Jarrell Transport, Inc. ("JTI"), a commercial trucking business located in Bastrop, Louisiana. Both husband and wife were personally responsible for most of the debts of the corporation. In 1997, the business was in financial trouble. In April of 1997, a deal was made with a larger trucking business out of Florida, Montgomery Tank Lines, Inc. ("Montgomery Tank"). JTI was made an affiliate of Montgomery Tank. In early July 1998, plaintiff got drunk, telephoned Montgomery Tank, cursed its representative, and threatened to bomb its facility. On July 15, 1998, Montgomery Tank terminated its agreement with JTI. The loss of affiliation with Montgomery Tank, together with IRS tax liens and cash flow problems worsened JTI's already desperate state.
In late July 1998, JTI retained a local attorney, Leo A. Miller. Plaintiff testified that as president of JTI he instructed Miller to file suit against Montgomery Tank and to seek the protection and reorganization of Chapter 11 Bankruptcy for JTI; however, within two weeks, by early August 1998, plaintiff was admitted into Doctors Hospital in Shreveport for detoxification and treatment of his severe alcohol problem. He remained in Shreveport under treatment until November 19, 1998.
During the time plaintiff was in Shreveport, the company was left in the hands of his wife. In October 1998, Miller prepared an act of partial partition of community property, transferring all of JTI's stock to Mrs. Jarrell as her separate property. Until this time, the stock had been community property, with the Jarrells each owning 50% of the shares. Plaintiff testified that he signed the document without reading it; he conceded that he was not prevented from reading it and that he was not under the influence of alcohol or drugs at the time. He claimed that his intent was to donate two percent of his 50% share in the corporation to give his wife 52% ownership so that she could effectively operate the company in his absence and compete for minority preference contracts and loans. Miller testified that the document he prepared was only a draft and that he gave it to Mrs. Jarrell to take to plaintiff in Shreveport for review and discussion and was surprised when the document was returned to him signed by plaintiff. Miller told Mrs. Jarrell to return to Shreveport and discuss the matter again with her husband; she later informed him that she had done so and that plaintiff understood the document.
On November 19, 1998, plaintiff left Shreveport, driving the 200 miles to Bastrop and along the way drinking a couple of fifths of vodka. When he got to Bastrop, he was intoxicated; he threatened his wife, broke windows in the office and company trucks using a tire iron, and generally wreaked havoc on JTI's property.
Plaintiff was arrested and jailed. The next day, Miller filed for divorce on behalf of Mrs. Jarrell and obtained restraining orders against plaintiff. Following his arrest, plaintiff engaged the law firm of McLeod & Verlander to respond to the divorce action filed by his wife, attempt to recover his shares of stock, and sue Miller. *643 In early 1999, while exploring the possibility of a reconciliation, both plaintiff and his wife consulted another attorney, Joseph Lebeau, to address the corporation's ongoing problems. Lebeau advised that the best course of action was to seek a loan rather than to sue Montgomery Tank or file Chapter 11 Bankruptcy.
Plaintiff claims that in February 1999, he and his wife had reached an agreement as to their domestic action. Plaintiff would receive 49% of JTI's stock and his wife, with 51% of the stock, would remain as president of the company. Miller, however, inserted a release of professional liability in the settlement proposal which plaintiff rejected. Later, plaintiff agreed to sign, but Mrs. Jarrell then refused to sign the agreement. Without the settlement, stock ownership of the corporation was in question, which, according to plaintiff, caused the loan to be denied in December of 1999 and led to the company's failure. As stated above, the financial restructuring of JTI was handled by attorney Joseph Lebeau, not Miller.
Plaintiff filed suit against Miller on November 17, 1999. Subsequently, Miller's legal malpractice insurer, Coregis Insurance Company, was added as a party.[2] In May 2000, plaintiff filed a separate suit against Mrs. Jarrell, who had divorced him, to recover his shares of JTI stock; however, he unilaterally dismissed that suit with prejudice in June 2001.
Exceptions of no right of action were filed by defendants asserting plaintiff's inability to seek damages on behalf of the corporate entity. On January 28, 2003, the trial court issued a ruling denying the exceptions. However, the trial court directed that, pursuant to the representation of plaintiff's counsel at the hearing on the exceptions, the only damages being sought were those applicable to the plaintiff and not the corporation.
Defendants filed a motion in limine which sought to limit evidence on several matters, including plaintiff's request for lost wages or earning capacity. This was based on the allegation that plaintiff had sustained an unrelated physical injury in March 1999, as a result of which he was permanently and totally disabled. For the same reason, defendants also filed a motion for partial summary judgment which was denied by the trial court. On the issue of the loss of stock, defendant asserted preclusion by judgment due to plaintiff's voluntary dismissal with prejudice of his suit against Mrs. Jarrell concerning JTI's stock.
A jury trial was held in the Spring of 2003. The jury found for plaintiff. Damages totaling $1,350,285 were awarded as follows: $500,000 in general damages; $623,110 in lost wages; and $227,175 for lost value of stock. The jury did not assess any fault to plaintiff. Judgment in conformity with the jury's verdict was rendered and signed.
Defendants filed a motion for new trial or, alternatively, JNOV. The trial court denied the motion in June 2003. It is from this judgment that defendants have appealed.

Discussion

Legal Malpractice
At trial, plaintiff presented expert testimony from attorney Robert Contois, who identified certain Rules of Professional Conduct which he believed Miller violated, particularly Rule 1.4  failure to communicate; Rule 1.2  failure to follow client's directions; and Rule 1.7  conflict of interest.
*644 Because JTI was a closely held family corporation, with Mr. and Mrs. Jarrell personally obligated for extensive corporate debt, Contois asserted that Miller's engagement in July 1998 was as attorney for the corporation and both Mr. and Mrs. Jarrell individually. Contois claimed that Miller violated Rule 1.2 in not carrying out the directives of Jarrell as president of JTI to sue Montgomery Tank and seek the protection of the bankruptcy court. According to Contois, Miller's breach of this ethical duty allegedly not only harmed the corporation, but also potentially exposed plaintiff to personal liability for the corporation's debt. Next, according to Contois, Miller breached his duties under Rules 1.7 and 1.4 in failing to recognize the inherent conflict between the spouses in the execution of the act of partial partition of the JTI stock in October 1998, and in neglecting to communicate and explain the consequences of that act to plaintiff. Mrs. Jarrell received the entire stock ownership of JTI by virtue of that transaction. Finally, Contois discussed Miller's breach of the conflict of interest rule in acting as Mrs. Jarrell's divorce attorney against plaintiff and in the settlement actions thereafter. All of these alleged ethical violations were not seriously disputed by Miller's insurer or their legal expert.
Whether based upon breach of contract or tort, an attorney malpractice claim has well-defined elements. To establish a claim for legal malpractice, a plaintiff must prove: 1) a duty arising from an attorney-client relationship; 2) breach of this duty by failure to exercise a reasonable degree of skill in counseling or representing a client; and 3) damages or loss arising out of the breach. Generally, a plaintiff can have no greater right against his attorney for negligent handling of a claim than is available in the underlying claim itself; that is, damages are typically measured by that amount which the client would have recovered but for the attorney's negligence. Costello v. Hardy, 03-1146 (La.01/21/04), 864 So.2d 129. This necessarily requires proof of the viability and worth of the claim lost because of the attorney's negligence.
Damages in this case have been divided into specific or economic damages for plaintiff's loss of his job and stock, and general damages for emotional distress.

Economic Damages
Plaintiff's attempt to connect the loss of his stock and job to the failure of Miller to carry out his instructions to sue Montgomery Tank and file for Chapter 11 protection must fail. In addition to the fact that these actions belonged to the corporation and not plaintiff as a shareholder individually, there was no showing of the viability or worth of either of these proposed causes of action. In fact, in early 1999, the Jarrells hired a second attorney, Joseph Lebeau, who specifically advised against pursuing this line of action in favor of restructuring with a long term loan.
Mr. and Mrs. Jarrell started the business and incorporated it in 1985. The stock was community property, even though the parties were issued equal shares. The October 1998 stock transfer prepared by Miller was, in fact, a partial partition of community property. Miller prepared a draft and had Mrs. Jarrell take it to her husband in Shreveport for his review. By his own testimony, plaintiff stated that he instructed Miller to transfer a majority (52%) interest to Mrs. Jarrell so that she could operate the company and take advantage of certain minority owner benefits. Plaintiff claimed that he did not read the document, which in fact transferred 100% of the stock to his wife, but that he simply signed it.
*645 When Mrs. Jarrell returned to Miller with the executed draft, she told Miller that plaintiff had signed but had not read the document. Miller expressed his concerns about plaintiff's understanding of the partition. He asked Mrs. Jarrell to return to Shreveport to discuss the contents of the draft with her husband. Mrs. Jarrell spoke again with plaintiff and then told Miller that plaintiff understood the contents and ramifications of the document. We note that Mrs. Jarrell, who has a separate action pending against Miller, was not called to testify at trial by either party.
Plaintiff's claim that Miller was deceitful in the presentment of the partition is seriously undermined by the clear language of the document and his admission that he did not read it. A person who signs a written contract is presumed to know its contents and cannot avoid its obligations by contending he did not read the document, or that it was not explained, or that he did not understand it, barring misrepresentation, fraud, or violence. Tweedel v. Brasseaux, 433 So.2d 133 (La.1983); Griffin v. Lago Espanol, L.L.C., 00-2544 (La.App. 1st Cir.02/15/02), 808 So.2d 833; Sonnier v. Boudreaux, 95-2127 (La.App. 1st Cir.05/10/96), 673 So.2d 713; Smith v. Leger, 439 So.2d 1203 (La.App. 1st Cir.1983).
If Mr. Jarrell had read the contract, he could have insisted on corrections to reflect his intent. We recognize, however, that because Miller might, at this point, have been considered plaintiff's attorney, there is some merit in the proposition that a client might sign a document prepared by his attorney without reading it. Contois, plaintiff's legal expert, opined that because plaintiff was obligated for the corporate debts, Miller was both his and JTI's attorney. This conclusion applies equally to Mrs. Jarrell, who owned half of JTI and was also obligated for the corporate debts. Accordingly, Miller would have been acting as both Mr. and Mrs. Jarrell's counsel.
Even so, plaintiff's claim for damages in an amount equal to the value of the stock he transferred to his wife is precluded by his own actions. In an effort to recover his stock, plaintiff brought suit against his ex-wife, but later dismissed the suit with prejudice, as he decided that the stock no longer had value. At trial, the jury awarded plaintiff damages for the value of this stock based on the presumption that his stock was stolen from him through the actions of Miller and Mrs. Jarrell.
Plaintiff first transferred all of the shares of stock to his wife in the partial community property settlement, then sued her to get back the shares; however, he dismissed that action with prejudice. Plaintiff is not a shareholder in the company and never again can be.
As stated by the supreme court in Costello v. Hardy, supra at 139, "[B]ecause Mrs. Costello asserts claims for damages against the attorneys in this malpractice action that were discharged in the settlement of the suit against the succession, the defendants are entitled to judgment as a matter of law dismissing the plaintiff's malpractice claim." In the present case, defendants are also entitled to a dismissal of the claim for the value of stock that plaintiff gave away.
In addition, plaintiff's CPA expert, Harry Kenneth Lefoldt, Jr., based his valuation of the stock on the assumption that the long term loan being pursued by Lebeau would be funded. He also valued the stock as of December 1999, the date that the loan commitment was withdrawn. Because Lefoldt based his testimony upon erroneous assumptions, defendants' motion to exclude this evidence should have been granted.
*646 In a personal injury lawsuit, plaintiff bears the burden of proving the causal relationship between the negligent act and any lost earnings. Avant v. Illinois National Ins. Co., 32,680 (La.App.2d Cir.01/26/00), 750 So.2d 394. To recover for actual wage loss, plaintiff must prove that he would have earned wages but for the legal malpractice in question. Boyette v. United Services Automobile Association, 00-1918 (La.04/03/01), 783 So.2d 1276.
Plaintiff testified that in March 1999, after Mrs. Jarrell agreed to allow him to return to JTI as an employee, he sustained a severe head injury. Plaintiff testified that he tried unsuccessfully to return to work but was disabled as a result of this injury. Dr. Tom Gulick, the neurologist who treated plaintiff, indicated that depression and anxiety were factors in this disability. Plaintiff's medical records reflected that his depression and stress existed several years before Miller's legal services were engaged. Lefoldt, plaintiff's CPA expert, who computed lost wages, admitted that he was unaware of the disabling head injury, sustained by plaintiff. Lefoldt conceded that if plaintiff had suffered a total disability there would be no basis for the recovery of lost income. Without such a basis, there could be no recovery. Therefore, the trial court erred in denying defendants' motion for partial summary judgment on this issue.

General Damages
We next turn our attention to the jury's award of $500,000 in general damages to plaintiff for emotional distress. Our supreme court has not yet explicated or developed a theory concerning mental anguish damages in an attorney malpractice case. In Costello v. Hardy, supra at 139, without any analysis, the supreme court rejected plaintiff's general damage request, stating only that "[N]o evidence of mental anguish or emotional distress was offered."
Damages for pain, suffering, anxiety, and humiliation caused by negligence are generally not recoverable in a legal malpractice action. This is because the foreseeable result of an attorney's negligence typically extends only to an economic loss. Obviously, a client will be annoyed and inconvenienced by an attorney's failure, for example, to file suit within the applicable time limits; however, the client can be fully compensated by recovery of the value of the claim the attorney allowed to prescribe. This suffices to return the client to his prior circumstances. The primary interest protected by the general rule is a property right which can be economically measured. Serious emotional distress is not believed to be an inevitable consequence of a purely monetary loss. Richards v. Cousins, 550 So.2d 1273 (La.App. 4th Cir.1989), writ denied, 552 So.2d 397 (La.1989); Douglas v. Delp, 987 S.W.2d 879 (Tex.1999).
Recovery for such an economic loss requires proof of the viability and worth of the negligently lost claim. This methodology has been characterized as a "suit within a suit." Chatelain v. Rabalais, 04-28 (La.App. 3d Cir.07/07/04), 877 So.2d 324; Beis v. Bowers, 94-0178 (La.App. 4th Cir.01/19/95), 649 So.2d 1094, writ denied, 95-0429 (La.03/30/95), 651 So.2d 847; Richards, supra. Some courts, however, that follow the general rule that mental anguish is not compensable would permit such damages when the attorney has acted reprehensibly or with heightened culpability. See Douglas, supra; Caddel v. Gates, 284 S.C. 481, 327 S.E.2d 351 (App.1984) (in which the court noted "though regrettable the overlooking of an encumbrance by an attorney examining title" is not outrageous conduct); Cummings v. Pinder, 574 A.2d 843 (Del.1990) (in which attorney conduct *647 in failing to advise client of right to sue her own insurer, unilaterally increasing his contingency fee and stopping payment on a settlement check was found to be intentional and outrageous misconduct).
There are cases in which the original claim negligently handled by the attorney will not be predicated upon an economic loss, such as cases involving issues of contested child custody or visitation, confinement to a mental hospital, imprisonment, adoption, etc. Not to allow mental anguish damages under these limited circumstances would leave such a client without a remedy and virtually immunize the negligent attorney. This would certainly be contrary to public interest and would not constitute sound public policy.
The focus should shift from the nature of the attorney's conduct, i.e., extreme and outrageous behavior, to the nature of the plaintiff's loss. This line of cases recognizes a mental anguish claim when plaintiff's damage is the loss of a personal interest such as liberty or child custody. See Chatelain, supra; Richards, supra; Wehringer v. Powers & Hall, P.C., 874 F.Supp. 425 (D.Mass.1995).
In the instant case, plaintiff sought specific or economic damages as well as general damages. He has now been denied these economic damages, leaving only his claim for emotional distress. While the outer boundaries of the law are not yet visible in Louisiana when dealing with emotional distress in legal malpractice cases, we find that under the circumstances of this case such damages are not warranted.
From August until November 19, 1998, plaintiff was in treatment some 200 miles away and was out-of-touch with the operations of the business. His wife was left to conduct the business and according to Miller, agreed with Miller's view that suing Montgomery Tank, which held a mortgage on JTI's property, and filing bankruptcy was unwise. We note that Mrs. Jarrell owned half of the stock and like plaintiff, was also personally liable for JTI's debts. Following plaintiff's reasoning, Mrs. Jarrell was also Miller's client. Plaintiff expressed to Miller his desire to transfer majority ownership of JTI to his wife. Clearly, Miller should have personally explained to plaintiff the ramifications of the document he drafted, but the record is devoid of any showing of an intent to deceive. Miller also should not have filed the divorce action; however, it is likely that if he had not, another attorney would have. It is clear that injunctive relief was necessary to protect JTI's property from plaintiff's drunken rampage. It is difficult to see any damages in filing for divorce on behalf of Mrs. Jarrell and obtaining restraining orders. Accordingly, we find there to be no cause of action for plaintiff's claim for mental anguish and emotional distress and conclude that the trial court erred in ruling otherwise. La. C.C.P. art. 927 provides that a failure to disclose a cause of action may be noticed by either the trial court or appellate court on its own motion.

Scope of Appellate Review
Plaintiff argues that it is beyond the province of this court to consider issues of causation and damages because defendants did not appeal the jury's verdict on these questions.
Defendants, however, assigned as error rulings on the admissibility of evidence and motions which they contend tainted the jury process and resulted in a verdict which was manifestly erroneous and clearly wrong.
For the reasons already discussed, we agree with defendants' argument.

*648 Conclusion

For the reasons set forth above, the judgment is reversed.
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment is rendered in favor of defendants, dismissing all of the claims of plaintiff. Each party, however, is to bear the expense of their own experts.[3]
REVERSED and RENDERED.
CARAWAY, J., concurs with written reasons.
GASKINS, J., concurs in part and dissents in part with reasons.
WILLIAMS, J., concurs in part and dissents in part for the reasons assigned by J. GASKINS.
CARAWAY, J., concurring.
While I agree with the majority opinion in all other rulings, I respectfully concur with the dismissal of the award for general damages for the following reasons.
Malpractice and ethical violations in the attorney/client relationship may be considered in terms of both contract and tort law. This contract/tort dichotomy, arising out of the professional/client relationship, causes difficult questions which courts might interpret differently under tort or contract theory, leading to unsettled law. For the following reasons, I believe the issue of mental anguish damages for the breach of the attorney's duties and ethics violations should be settled under our law governing damages for conventional obligations.
To bring this issue into proper focus in this case, a sizeable portion of the jury's $500,000 award for aggravation and mental anguish no doubt resulted from Miller's filing of Mrs. Jarrell's divorce and injunction proceedings against Mr. Jarrell. Miller had been both spouses' attorney regarding their business endeavors. Yet, despite the conflicting interests, Miller filed the divorce suit. At trial, Mr. Jarrell asserted this ethical breach; his expert witness explained the conflict of interest and ethics violation to the jury; and the jury awarded mental anguish damages for this breach of the duty of client loyalty, among the many other ethical violations asserted by plaintiff. Nevertheless, there was no pecuniary loss attributable to Mr. Jarrell because of Miller's filing of the divorce suit.
In the traditional tort setting involving personal injury, non-pecuniary damage awards for mental anguish and pain are made under the general authority of La. C.C. art. 2315. Depending upon the nature of physical injury, Louisiana courts allow discretion to the trier-of-fact for a range of non-pecuniary awards recognizing that such damages for emotional distress and pain and suffering are insusceptible of precise measurement. La. C.C. art. 1999; Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Nevertheless, when no ancillary personal injury is involved, the courts and the legislature have crafted strict rules for the measure of mental anguish standing alone. See Lejeune v. Rayne Branch Hosp., 556 So.2d 559 (La.1990) and La. C.C. art. 2315.6 (requiring severe, debilitating and foreseeable emotional distress for awards to persons who witness the injury of a relative); White v. Monsanto Co., 585 So.2d 1205 (La.1991) (awards for the tort of intentional infliction of emotional distress require proof that the conduct of defendant was extreme and outrageous and the emotional distress suffered by *649 plaintiff was severe); La. R.S. 23:1021(7)(b) (provides for special proof in worker's compensation cases for so-called mental/mental injury); Atwood v. Hylan, 28,971 (La.App.2d Cir.12/11/96), 685 So.2d 450, 454 (damages for mental anguish may be awarded to persons whose property was damaged by intentional or illegal acts, by acts giving rise to strict liability, by acts amounting to a continuing nuisance, or where the property owner was present at the time or shortly after the damage was negligently inflicted and suffered a psychic trauma similar to a physical injury as a direct result of the accident).
The use of tort theory for recovery of the mental anguish caused by the breach of an ethical duty of an attorney or mere negligent representation is fraught with problems. How should juries grade the mental anguish distinctions between a client in an emotional family law dispute, whose attorney does not return telephone calls, and a client whose attorney makes a procedural or tactical error placing a claim in jeopardy for an extended time period of worry and anxiety? One client experiences a breach of an ethical duty; the other a negligent breach of a competency duty. Yet, neither client under those circumstances may experience any economic or pecuniary damage. Even if they do experience economic damages, which are recoverable from the attorney, the mental anguish may be the same or greater in the case without concomitant economic loss. In which of these circumstances should a client be awarded damages for his mental anguish, and how extensive must that anguish be? I am reluctant to open these damage assessments to tort theory because of the difficulties and inconsistencies which can be expected to result in making awards for mental anguish damages in settings where no physical injury is experienced by the plaintiff/client.
I am also reluctant to venture into this new realm for purposes of deterring attorney misconduct because of our existing law regulating attorneys. Our Louisiana Constitution provides in Article 5, Section 5, that the Louisiana Supreme Court has exclusive original jurisdiction of disciplinary proceedings against a member of the bar. Under that jurisdiction and its inherent judicial power, the supreme court has exclusive authority to regulate the practice of law. O'Rourke v. Cairns, 95-3054 (La.11/25/96), 683 So.2d 697. In bar disciplinary matters, the court acts as triers-of-fact and conducts an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re Pinkston, 02-3251 (La.5/20/03), 852 So.2d 966, cert. denied, ___ U.S. ___, 124 S.Ct. 1413, 158 L.Ed.2d 81 (2004). Despite this authority, the jury in this case served as the trier-of-fact of the multiple ethics violations alleged by plaintiff, and the jury's deterrent of the $500,000 award would have a new regulatory effect on the practice of law.
In contrast, under our law for conventional obligations, the Civil Code contains specific provisions limiting awards for non-pecuniary damages. La. C.C. art. 1998 provides:
Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.
In addition to Article 1998, Article 1997 provides for contractual damages, whether "foreseeable or not," in the event of a bad faith breach of a contract. Nevertheless, as reviewed by this court on two occasions, *650 Article 1997's allowance for damages for a bad faith breach of contract applies only to unforeseeable, pecuniary losses, and not non-pecuniary losses. Nolan v. Commonwealth Nat'l. Life Ins. Co., 28,777 (La.App.2d Cir.11/1/96), 688 So.2d 581, writ denied, 97-0490 (La.4/18/97), 692 So.2d 449; Simpson v. Restructure Petroleum Mktg. Services, Inc., 36,508 (La.App.2d Cir.10/23/02), 830 So.2d 480.
Accordingly, when the professional service relationship between the attorney and client is viewed as contractual, the $500,000 non-pecuniary award for Mr. Jarrell's emotional distress from Miller's multiple ethics violations is inappropriate. It is not that mental anguish does not exist after a breach of a contractual relationship. Such damage is simply not recoverable in most cases.
This conclusion that contract law applies to govern such damages has apparently been the prevailing understanding of the nature of the malpractice action in Louisiana. Despite the many such actions and ethical duty violations by members of the bar, who have been disciplined in reported cases, a general damage award for mental anguish caused by an attorney has never been awarded by our highest court.
In conclusion, I believe the award of $500,000 for mental anguish in this case should be reversed because of our law of conventional obligations. In the early 1970's, before the passage of special laws concerning medical malpractice, Justices Tate and Barham in a dual concurrence made the following statement concerning medical malpractice in a 1975 case:
Plaintiffs' suit for medical malpractice can only be said to arise out of their contractual relationship with their doctor. The surgery which is alleged to have caused permanent disability to plaintiffs' minor child came about under the doctor's contract to perform that surgery. This contract can be breached by negligent acts as well as intentional acts. A part of the doctor's contractual obligation was to use care, prudence and skill in his performance. Here it is alleged that the performance of the obligation was done in a negligent manner and that it caused damage to the plaintiffs and their minor child. This constitutes a suit for breach of contract. Any other conclusion is difficult to reach intellectually.
Steel v. Aetna Life and Casualty, 315 So.2d 144 (La.1975). This insightful argument has much greater application for legal malpractice, which, unlike medical malpractice, involves no physical injury from which mental anguish, pain and suffering can be measured. Accordingly, I concur in the reversal of the $500,000 general damage award.
GASKINS, J., concurs in part and dissents in part with reasons.
GASKINS, J., concurring in part and dissenting in part.
I respectfully concur and dissent from the majority's opinion.
I concur in the reversal of damages for lost wages. However, I dissent from the reversal of the defendants' remaining assignments of error. Unless justice requires otherwise, a court of appeal reviews only issues contained in the assignments of error on appeal. Accordingly, I will address only those areas of complaint brought before this court.
The manifest error rule mandates that we affirm a jury's verdict if reasonable, based upon the evidence. While members of this court might have reached different conclusions had we been sitting as the trier of fact, the instant judgment was rendered by jurors who had evidence presented to them upon which they could reasonably make findings. While I might *651 have made the same determinations as the majority had I been the trier of fact, I must now respect those findings made on evidence presented to the jury.
Among their assignments of error, the defendants maintained that the trial court erred in denying their exception of no right of action and motion in limine and in allowing the plaintiff, an individual, to present evidence pertaining to legal malpractice in Miller's representation of JTI, a corporate entity which was not a party to the suit.
A great deal of the evidence presented at trial concerned Miller's representation of JTI, not his limited representation of the plaintiff as an individual. In particular, there was evidence that Miller did not file a lawsuit against Montgomery Tank on JTI's behalf, he did not file for bankruptcy for JTI, and he did not properly account for fees paid by JTI. The plaintiff lacked the capacity to seek damages for these alleged wrongs against the corporate entity of JTI. However, I do not find that this additional evidence was necessarily confusing to the jury. Also, presentation of some of this evidence was necessary to give the jury an accurate overview of how the situation between the plaintiff and Miller arose. Consequently, I would not have granted relief on this issue.
The defendants also complained that the trial court erred in denying their motion in limine and in overruling their objections to the testimony of the plaintiff's legal expert, Robert Contois. In particular, the defendants objected to Contois being allowed to testify about Miller's alleged violations of the Code of Professional Responsibility in his representation of the corporate entity of JTI. They argued that this blurred the legal distinction between the claims of the plaintiff and those of JTI. However, the trial court has considerable discretion in ruling on the admissibility of expert testimony. After reviewing Contois' testimony, I do not believe that the court abused its discretion. Although Contois' testimony about JTI was only of marginal assistance to the jury, it does not appear to have been unduly confusing or prejudicial.
The defendants further claimed that the trial court erred in allowing the testimony of Harry Kenneth Lefoldt, Jr., the plaintiff's CPA, when his computations for lost wages and lost value of stock were supposedly based on unreliable information. Since the testimony of the plaintiff's CPA was based upon several erroneous assumptions, the defendants argue that it should have been excluded. The trial court denied the defendants' motion to exclude, stating that their complaints went to the weight, not admissibility. I would agree, noting that counsel for the defendants vigorously challenged Lefoldt's testimony on cross-examination and pointed out its various weaknesses for the jury's benefit.
The defendants maintained that the trial court erred in denying the defendants' motion in limine and partial motion for summary judgment which were based on preclusion by judgment. Although the plaintiff made a passing reference to the alleged fraudulent conduct of Miller in the suit against Mrs. Jarrell, the gist of that suit was to rescind the partial partition and obtain the return of the stock. The interests of justice do not mandate that the plaintiff be compelled to bring his legal malpractice claim against the lawyer involved in the partition in the same suit, especially when the plaintiff had additional allegations of malpractice against the attorney.
Because of its reversal, the majority opinion did not address the assignment of error regarding prescription. In this assignment, the defendants argued that the trial court erred in denying the defendants' exception of prescription regarding *652 the act of partial partition when the plaintiff's malpractice suit was filed 13 months after the document was executed. The jury concluded that Miller represented the plaintiff as an individual. The evidence supports such a conclusion; it further substantiates a finding that this representation continued until the divorce suit was filed on November 20, 1998. Thus, under the continuing representation rule, the plaintiff's claims as to the partial partition did not prescribe prior to the filing of his malpractice action against Miller.
As previously stated, I would affirm the judgment of the trial court as to all of the defendants' assignments of error except the one pertaining to lost wages. Accordingly, I concur in part and dissent in part.
WILLIAMS, J., concurs in part and dissents in part for the reasons assigned by J. GASKINS.
NOTES
[1] The Jarrells are now divorced.
[2] The policy insuring Miller was actually issued by Westport Insurance Company, the successor to the professional liability section of Coregis.
[3] The total fees for the two legal experts of $54,000 appear excessive.