HUNTSMAN
INTERNATIONAL, L.L.C. AND
RUBICON, L.L.C.

VERSUS

PRAXAIR, INC.

*     NO. 2022-CA-0777

*     COURT OF APPEAL

*     FOURTH CIRCUIT

*     STATE OF LOUISIANA

*

*

* * * * * * *

DLD     **DYSART, J., CONCURS IN PART AND DISSENTS IN PART**

      I concur with the majority's decision insofar as it affirms the trial court's findings that Praxair breached its contracts with Huntsman and caused damages to Huntsman. I respectfully dissent from the majority's decision to affirm the amount awarded to Huntsman for lost profits. I would amend the judgment to reduce the award for lost profits to $37,522,291, which, in my opinion, is the highest amount supported by the evidence presented at trial.

      The only award at issue in this appeal is one for lost profits. Lost profits are a type of special damages that must be proved with reasonable certainty and cannot be based on speculation or conjecture. *Cox, Cox, Filo, Camel & Wilson, LLC v. Louisiana Workers' Comp. Corp.*, 2021-00566, p. 11 (La. 3/25/22), 338 So.3d 1148, 1157. "While recognizing that lost profits may not always be susceptible of proof to a mathematical certainty, [our courts] have held that lost profits must nonetheless be proven with reasonable certainty, that is, by a preponderance of the evidence." *Cargill, Inc. v. Syngenta Seeds, Inc.*, 2021-681, p. 11 (La. App. 5 Cir. 12/7/22), 355 So. 3d 103, 111.

      Huntsman's expert on economic damages, Rebecca Szelc, was the only expert witness who testified at trial as to calculations of damages Huntsman allegedly sustained in lost profits. In pre-trial discovery, no other Huntsman

witness attempted to quantify the damages sustained by it due to Praxair's breaches. Instead, several of those witnesses, in depositions, specifically deferred to Huntsman's expert to provide those calculations.

Ms. Szelc prepared a report with data provided by Huntsman and calculated the damages sustained by Huntsman in lost profits and cover damages. At trial, she testified that she determined the amount of Huntsman's lost pounds of MDI and aniline production that she found attributable solely to Praxair's breaches, and the contribution margins Huntsman would have earned for the months of lost production. Ms. Szelc explained that a contribution margin was an amount Huntsman would have received for every pound of production it made after subtracting expenses. She multiplied lost pounds of production by the contribution margins she determined to arrive at a total amount of lost profits.

Ms. Szelc testified that in a month where there was lost production due solely to Praxair's shortages, she used contribution margins that were weighted averages of all of the products sold during that month at the profit that Huntsman sold them. She explained that she adjusted the contribution margins for each month because it could not be determined which products Huntsman did not produce or sell during that period of time. There are many different types of MDI produced and sold by Huntsman so she used a weighted average contribution margin of all of the MDI products Huntsman sold in a given month. She used the average of what she referred to as the "product mix," or, as she described, the mix of MDI flavors sold in that month at the volumes sold. She then calculated the weighted average contribution margin for that product mix for that month.

Ms. Szelc stated that when Huntsman had a supply interruption, the lost pounds of production were taken away from what would have been the typically more lucrative spot sales. She acknowledged that by using weighted average contribution margins of all types of sales in her calculations, this was a

conservative approach that could result in an underrepresentation of Huntsman's losses given the fact that Huntsman did not lose contract sales due to Praxair's breaches. However, Ms. Szelc maintained that the way she determined what contribution margins would have been for lost sales was "the best or the fairest representation" given the fact that the product mix changes every month and the prices products sell for changes because of market conditions and cost inputs among other factors.

Ms. Szelc found that the weighted average contribution margins for the total loss to Huntsman was 36 cents for MDI production and 8 cents for aniline production. Multiplying the amount of pounds of lost production that she determined were caused by Praxair's shortfalls by the above-stated average contribution margins, Ms. Szelc calculated that Huntsman sustained $35,142,940 in lost MDI sales and $2,379,351 in lost aniline sales for a total loss of profits of $37,522,291.

Several of Huntsman's fact witnesses testified at trial that their own expert's calculations were overly conservative, but none of those witnesses presented testimony supporting a different method of calculating contribution margins that rose to the level of reasonable certainty required for this item of special damages. Huntsman's fact witnesses used general terms such as "conservative," "floor," and "rock bottom," to describe Ms. Szelc's calculations. Although Huntsman now disparages its own expert's calculations as overly conservative, there is no evidence that Huntsman asked Ms. Szelc, prior to trial, to provide a supplemental report with a range of calculations.

In closing arguments, counsel for Huntsman argued that Ms. Szelc should not have included Huntsman's contract sales in her calculation of contribution margins because those sales were never lost due to Praxair's shortages. After stating "I think there are a couple of other ways to calculate this," counsel urged

the jury to examine the spreadsheets used by Ms. Szelc, and apply much higher contribution margins than those calculated by Ms. Szelc. Counsel suggested two alternative methods of calculating contribution margins that he argued were more reflective of Huntsman's losses.

Counsel first showed a slide to the jury, which set forth a formula for calculating lost profits using contribution margins of 82 cents for MDI and 25 cents for aniline. He argued that those higher contribution margins were consistent with what Huntsman's spot sales, the top third of Huntsman's business, typically generate. He stated that those contribution margins would result in a lost profits award of $88,117,405. Counsel also presented another alternative method of calculating even higher contribution margins that he argued were more typical of what sales to Huntsman's top 100 customers would generate. Those contribution margins, multiplied by the amount of lost production, would result in an award for lost profits of approximately $186 million. The jury awarded Huntsman $88,117,405 for lost profits - an increase of $50,595,114 over the amount calculated by Huntsman's own economic damages expert.

While a jury is not bound by an expert's opinion, in this case, the only evidence presented at trial that established an amount of lost profits with reasonable certainty was Ms. Szelc's report and testimony. She was the only witness who testified regarding calculations as to contribution margins to be used in determining lost profits. The record does not include any other evidence that established with reasonable certainty any other amount of lost profits than those calculated by Ms. Szelc. "Argument of counsel, no matter how artful, is not evidence." *Hous. Auth. of New Orleans v. King*, 2012-1372, p. 4 (La. App. 4 Cir. 6/12/13), 119 So. 3d 839, 842, citing *Houston v. Chargois*, 98-1979 (La.App. 4 Cir. 2/24/99), 732 So.2d 71, 73.

As stated above, "while recognizing that lost profits may not always be susceptible of proof to a mathematical certainty, [our courts] have held that lost profits must nonetheless be proven with reasonable certainty, that is, by a preponderance of the evidence." *Cargill, Inc. v. Syngenta Seeds, Inc.*, 2021-681, p. 11 (La. App. 5 Cir. 12/7/22), 355 So. 3d 103, 111. The record shows that although the amount of lost profits in this case could not be determined to a mathematical certainty, the only economic damages expert who testified in this case presented her well-reasoned opinion as to the amounts she determined that Huntsman sustained in damages for lost profits that were caused by Praxair's breaches. She gave a detailed explanation as to how she arrived at her conclusions and the factors she considered in doing so. In my opinion, the calculations reached by Ms. Szelc were proven with reasonable certainty and were as "precise as circumstances in a particular situation allow." *Citadel Broad. Corp. v. Axis U.S. Ins. Co.*, 2014-0326, p. 4 (La. App. 4 Cir. 2/11/15), 162 So. 3d 470, 475.

As noted in *First Alarm Fire Equip., Inc. v. Southland Int'l of Louisiana, Inc.*, 47,823, p. 8 (La. App. 2 Cir. 5/8/13), 114 So.3d 1168, 1172, "a party's own detailed testimony as to his loss may be sufficient to support an award for loss of profits." (citing *Rosbottom v. Office Lounge, Inc.,* 94-894 (La. App. 3 Cir. 4/5/95), 654 So.2d 377). "But generally a claim for lost profits cannot rest solely on the testimony of the injured party without being substantiated by other evidence." *Id.* (citing *Simpson v. Restructure Petroleum Marketing Services, Inc.,* 36,508 (La. App. 2 Cir. 10/23/02), 830 So.2d 480). In this case, no testimony or evidence presented at trial established with reasonable certainty any amount of lost profits higher than that determined by the economic damages expert.

Accordingly, I would find that the jury erred in awarding $88,117,405 to Huntsman for lost profits, and I would amend the judgment to reduce the award for lost profits to $37,522.291.